### NATIONAL LABOR RELATIONS BOARD v. TOVREA PACKING CO.

No. 9254.

Circuit Court of Appeals, Ninth Circuit.

April 30, 1940.

Rehearing Denied June 20, 1940.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Bertram Edises, Samuel Edes, and Ramey Donovan, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

William A. Evans and Denison Kitchel, both of Phoenix, Ariz., for respondent.

Before WILBUR, MATHEWS, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

The National Labor Relations Board, acting under authority of the National Labor Relations Act [49 Stat. 449, 29 U.S. C. § 151, et seq., 29 U.S.C.A. § 151 et seq.], herein referred to as the Act, is here petitioning for an order of enforcement of its order [Sec. 10(e) Act] against Tovrea Packing Company, an Arizona corporation, herein referred to as Respondent. The Tovrea Employees' Association appears as intervenor.

Following conventional procedure, the Board found the Respondent company guilty of unfair labor practices [Sec. 8(1) (2) (3) Act] and issued its order[1] to cease and desist certain practices and to reinstate nine discharged workmen with back pay under facts which may be briefly stated as follows:

Respondent is engaged in the general meat packing business. It purchases, feeds, slaughters, processes and markets livestock. A large percentage of such stock and essential materials used in the business are shipped in interstate commerce. Respondent operates and maintains feeding

---

[1] So much of the Board's order as is necessary to an understanding of this proceeding is here set out:

"* * * respondent, Tovrea Packing Company * * * shall:

"1. Cease and desist from:

"(a) Discouraging membership in Amalgamated Meat Cutters and Butcher Workmen of North America or any other labor organization of its employees, by discriminating against its employees in regard to hire or tenure of employment or any term or condition of employment;

"(b) Dominating or interfering with the administration of Tovrea Employees' Association, or dominating or interfering with the formation or administration of any other labor organization of its employees, or contributing support thereto;

"(c) In any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, or to engage in concerted activities for the purpose of collective bargaining or other mutual aid and protection as guaranteed in Section 7 of the Act;

"(d) Giving effect to its contract with Tovrea Employees' Association.

"2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

"(a) Withdraw all recognition from Tovrea Employees' Association as a representative of any of its employees for the purpose of dealing with it concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work, and completely disestablish said Association to such representative;

"(b) Offer to [naming nine individuals] immediate and full reinstatement * * *.

"(c) Make whole the employees named in 2 (b) above for any loss of pay they will have suffered by reason of the termination of their employment by payment to each of them, respectively, of a sum of money equal to that which each would normally have earned as wages from the date of such termination to the date of the offer of reinstatement or placement on the preferential list as ordered in paragraph (b) above, less his net earnings during said period; deducting, however, from the amount otherwise due to each of the said employees, monies received by said employee during said period for work performed upon Federal, State, county, municipal, or other work-relief projects; and pay over the amount, so deducted, to the appropriate fiscal agency of the Federal, State, county, municipal, or other government or governments which supplied the funds for said work-relief projects;

"(d) Post immediately in conspicuous places throughout its plants and other places of employment, and maintain for a period of at least sixty (60) consecutive days, notices that the respondent will cease and desist in the manner aforesaid * * *."

pens, retaining pens, and a feed mill adjacent to its packing plant. The cattle at the feeding pens are fed chopped hay, higera ensilage, cotton seed meal, cotton seed hulls, barley, and molasses in varying quantities. This feed is mixed by hand and distributed by men employed as cattle feeders. The cattle fattened in the feeding pens are moved from one section of the feeding pens to another section thereof until they reach the retaining pens and are then ready for the killing floor in the plant. At the time of the hearing the Respondent had approximately 10,000 head of cattle in the plant pens. The major portion of such fattened stock is slaughtered and processed in Respondent's adjacent packing plant while a substantial portion is shipped to market on the hoof. There is one general manager over the affairs of this packing plant and the mill and feeding pens. Respondent is not only in the business just described but operates four cattle feeding ranches. The ranch known as Topaco No. 2 was taken at the hearing before the Board as typical, and its manager testified that it "consists of 640 acres divided up into various fields, and in the southeast corner it contains three feed lots sections comprising about 35 acres in all * * *. We raise general agricultural crops such as hay, alfalfa hay, grain hay, higera, and sometimes sedan grass for hay and pasture * * ". A large portion of the cattle food consumed on each one of the ranches is grown thereon or in its vicinity. While some stock is moved from ranch to packing plant, most of the stock fattened on the ranches is not marketed in any way through the packing plant and most of the stock fattened in the feeding pens adjacent to the packing plant comes to it from sources other than the ranches to which reference has been made. As stated in Respondent's brief, "There are no transfers of employees between the feed lots and the plant and there are no duties common to employees in the two operations".

The nine employees whose reinstatement has been ordered were working in the mill and feeding pens at the time of their discharge, and Respondent claims that their work was agricultural in character and that according to the terms of the Act [Sec. 2(3)] the Board's order could not properly apply to them. The viewpoint of Respondent is, that the adjacent mill and feeding pens are operated separately and practically independently of the packing plant, and that the work performed is practically the same as that done on Respondent's stock feeding ranches, which of course is agricultural work. That, so runs the argument, since the status of the employee "depends entirely on the nature of the work which he is employed to perform", it follows that the mill and feeding pen employees occupy the status of agricultural employees.

The difficulty with Respondent's position is: (a) The feed mill and feeding pens adjacent to the packing plant are maintained as an incident to and not independent of the operation of the packing plant; (b) The nature of the work alone does not determine the status of workers under the provisions of the Act. We are not called upon to determine the status of the employees on the ranches but we do not hesitate to say that while the grinding of the feed and the actual feeding on the ranches may be quite similar to such work done adjacent to the packing plant, divergent circumstances may well throw the employees of the ranches without and those of the packing plant within the terms of the Act.

Labor on a cattle ranch is as agricultural in nature as labor on a wheat growing farm. 3 Corpus Juris Secundum, Agriculture, § 1, pp. 365, 366. But here we do not have stock raising or feeding as an incident to a stock ranch, nor do we have stock feeding or conditioning as a separate activity, but we do have stock ready for conditioning and fattening confined in relatively small corrals and fed intensively for short spaces of time as an incident to a meat slaughtering and packing industrial enterprise. The elements of agricultural labor as distinguished from non-agricultural labor, seems entirely lacking. See North Whittier Heights Citrus Ass'n v. National Labor Relations Board, 9 Cir., 109 F.2d 76 (Jan. 12, 1940), and cited authority. We see no effective relation between the packing plant with its adjacent mill and pens and Respondent's ranches. We hold that none of the laborers therein are agricultural laborers and that all are within the purview of the Act.

The Board found that nine of such employees had been discriminatorily discharged because of their membership in and activity in the interests of a union and that Respondent has engaged in unfair la-

bor practices as defined by § 8(1), (2) and (3) and that said unfair labor practices are unfair labor practices affecting commerce within the meaning of § 2(6) and (7) of the Act.

Briefly the supporting evidence is as follows:

Relevant events date back to October, 1937, when strong hints of dissatisfaction among the feeding pen and mill employees reached the foreman, Walter Le Barron. Le Barron sought information from an employee, B. B. Henry, and learned that the men wanted a raise in wages. B. B. Henry at Le Barron's suggestion arranged for a committee of three employees, Le Barron, B. B. Henry, and Cline, to confer with the plant's general manager, who was also president. For some reason the conference was never held. B. B. Henry testified that shortly after the appointment of the committee he got from Cline that Le Barron thought it would be all right to ask for a little more money for those who handled the teams and the cattle. B. B. Henry according to his testimony disapproved of this to Cline and instead suggested a raise of ten cents an hour for all the employees in the feed lots. The next day Cline told B. B. Henry that he was quitting the committee; that there was "a report up in the office that we were going to have a strike down there, and if we went up we would all get canned". Shortly afterward Le Barron laid B. B. Henry off because he had "too many slick mangers"—he was not giving the cattle enough feed. When B. B. Henry denied the charge Le Barron said, "I'm on the spot. I can't talk." A week or so later the hiring foreman told B. B. Henry that a lot of men lost their jobs because of union activity. B. B. Henry had been in the Respondent's employ for over a year and there was no evidence of any former complaints against him. It cannot be said that this evidence is not substantial in support of the Board's conclusion that B. B. Henry's discharge was discriminatory because of his membership on a committee of employees whose purpose was to induce the payment of higher wages.

An organized Union of some of the employees held its first meeting November 26, 1937, which was followed by another three days later, at which Woodrow Wilson and Wilford Henry were elected president and vice-president respectively. Wilson was discharged the same day and Wilford Henry the next.

Le Barron accused Wilson of improperly mixing the feed and allowing the trucks to obstruct the cattle pass way, but there is testimony that he told Wilson that if he would go home and say nothing about the Union or go to any of their meetings he would be back on the job in a few days. When Wilford Henry was discharged he was accused of leaving the feed gate open permitting the cattle to get out, but this he denied. There is evidence that Le Barron had warned Wilford Henry about talking unionism, and that he had told Wilford Henry that he was a pretty good feeder but if the union talk got to the office he would have to lay him off. We hold that the Board's conclusion that these two men's discharge was discriminatory is supported by the evidence.

Six additional discharges or lay offs occurred within a few days thereafter—all members of the union, and there is ample evidence to support the Board's conclusions that these men were discharged or laid off discriminatorily because of their union activity. There is also evidence to the effect that the discharges or lay offs were because of an economy movement. But the Act itself provides that we are not the triers of fact and that we have no authority to weigh the testimony and revise the Board's factual conclusions which are supported by substantial evidence.

■ Prior to the union activity hereinbefore narrated an organization of the Respondent's employees, known as the Tovrea Employees' Association, had existed for some time, and the evidence shows it to have functioned along social lines. Soon after the organization of the union heretofore referred to, which was a local affiliated with the American Federation of Labor, the Association became very active. Its membership grew rapidly and it changed its character to that of a union of employees. The president of the old organization resigned because as foreman of Respondent's shipping department he acted in a supervisory capacity and was therefore not eligible to retain membership. Respondent's vice-president and general manager advised a committee that the organization could no longer meet on Respondent's property. In shortly less than three weeks after this transformation, Re-

spondent and the Association entered into an agreement for collective bargaining with a provision that either party could be relieved therefrom after a ten day's notice. There is evidence to the effect that the resigned president of the Association suggested the name of his successor; that a foreman suggested the name of one to go on a committee; that the committee met in Superintendent Belnap's office; that Mr. Laurent, assistant auditor of Respondent, was practically the leader in the reorganized Association; that at the meeting in Mr. Belnap's office Mr. Tovrea stated that the company would bargain with the Association; that Mr. Bainbridge stated to the witness Morgan that they would get Tovrea's Association together and get their membership strong enough so that they could keep out all outside organizations. There is other evidence calculated to show that the Respondent sought to discourage and defeat the formation of the union by encouraging what was unquestionably a company organization of employees.

We hold that there is substantial evidence to support the Board's conclusions that Respondent dominates the Association and thereby and through other acts has interfered with the formation and administration of another labor organization of the employees, and that its order in relation to such Association must in all respects be enforced. The evidence is also amply sufficient to support the Board's conclusions that the Respondent did interfere in the employees' right of self organization et cetera and we think it would not be useful to repeat or call special attention to such evidence.

■ The order for reinstatement with back pay included the provision that there should be deducted from such pay "his net earnings during said period; deducting, however, from the amount otherwise due to each of the said employees, monies received by said employee during said period for work performed upon Federal, State, county, municipal or other work-relief projects; and pay over the amount, so deducted, to the appropriate fiscal agency of" the governmental agency "which supplied the funds for said work-relief projects". The Board has in several cases made the requirement that the sum deducted on account of relief-work payments should be returned to the source of such payments by the company required to make the back pay. So far as we have been able to ascertain, no court has passed upon the legality of such an order after the point has been argued, with the possible exception of the Third Circuit Court of Appeals, in Republic Steel Corp. v. National Labor Relations Board, 3 Cir., 1939, 107 F.2d 472, 478. In that case a like order was held to be within the discretionary power of the Board and not unreasonable. The second circuit in National Labor Relations Board v. National Casket Co., 2 Cir., 107 F.2d 992, 998, called attention to the inclusion of this requirement in the Board's order, and remarked, "The validity of this provision has not been argued and we express no opinion on the point." Judge L. Hand filed a dissenting opinion as to other subjects but on the one under discussion specifically agreed with the court's expression as above quoted.

The Act, § 10(c), 29 U.S.C.A. § 160(c), provides for "reinstatement of employees with or without back pay, as will effectuate the policies of this Act [chapter]". For a proper understanding this statement must be read and considered as a whole. To our minds the discretion conferred upon the Board is limited to the point of whether an order for back pay will do more toward effectuating the purposes of the Act than to omit it—or possibly than an order for payment of part thereof. Whether or not this provision is held to be punitive in nature, we see no warrant for doing other than it provides. Certainly it does not authorize the Board to go outside of the statute and prescribe its own coercive measures in aid of "effectuating" the purposes of the Act. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Remington Rand, 2 Cir., 94 F.2d 862, 872.

We have discussed each objection to the enforcement of the Board's order without lengthy quotation and discussion of fact and without citation of numerous authorities. It seems to us that the time has come when the fundamentals underlying the Wagner Act need not be the subject of treatises in every opinion upon the petition of the National Labor Relations Board for enforcement of its orders.

Let the order of the Board be enforced, excepting, however, that portion thereof

in regard to payment to the Government agencies of amounts deducted from back pay awards by reason of monies received by the employees for work performed upon work-relief projects.