### NATIONAL LABOR RELATIONS BOARD v. ABBOTT WORSTED MILLS, Inc.

No. 3752.

Circuit Court of Appeals, First Circuit.

April 23, 1942.

William S. Gordon, Jr., of Boston, Mass. (Robert B. Watts, Ernest A. Gross, Gerhard P. Van Arkel, and Thomas E. Shroyer, all of Washington, D. C., on the brief), for petitioner.

John P. Carleton, of Manchester, N. H. (McLane, Davis & Carleton, of Manchester, N. H., on the brief), for respondent.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

PER CURIAM.

The National Labor Relations Board petitions for enforcement of its order dated October 30, 1941, directed against Abbott Worsted Mills, Inc. of Wilton, New Hampshire. 49 Stat. 454, 29 U.S.C.A. § 160(e). Respondent's sole point in opposition is that the record contains no substantial evidence warranting the Board's finding that Wilfred Champagne was laid off or discharged because of his efforts at the plant to revive a local of Textile Workers Union of America (C.I.O.). It is conceded that respondent is subject to the Act. No exception is taken to the remedial terms of the order.

Champagne had worked as a weaver in respondent's plant since 1933, the oldest weaver in point of service. Lucas, the overseer of weavers, testified that Champagne was "a willing worker" and "as good a weaver as I have seen or been with at any time." James D. Abbott, a director and the active manager of respondent, acknowledged that Champagne was "an exceptionally good weaver." Respondent's president, Edward J. Abbott (who was the father of James), testified that Champagne was "a good weaver" and "a little better than the average."

In 1935 Champagne was secretary of an American Federation of Labor local which was organized at respondent's plant but which did not survive for long. During the latter part of 1938 efforts were made by the Textile Workers Union of America to organize a local at the plant and Champagne was elected secretary-treasurer, in which capacity he met with the management as a member of the union's committee. Thereafter the Wilton Worsted Workers Association was formed, and after an election it was certified by the Board in Jan-

uary, 1940, as the exclusive bargaining agency of the respondent's employees. Champagne joined that organization and became an active member of its executive committee.

After some months the Association still had not achieved a written contract with respondent. Champagne became dissatisfied with the organization, ceased paying dues and was automatically suspended. In September, 1940, he attempted to reorganize the local of the Textile Workers Union. He held a meeting with union organizers inside and outside his home, which was about 500 feet from the mill and in plain sight of workers coming to and from work. As a result of that meeting, letters were sent to about 20 of the employees, criticizing the Association as an ineffective bargaining agency and requesting help in reviving the local of the Textile Workers Union. Lucas knew of these activities; they were, he conceded, "common talk in the mill." James Abbott disclaimed any knowledge of Champagne's C.I.O. activities: "I tried not to know it. I would simply close my ears when anything like that would come up. As a mill official I made it my business to disclaim and immediately forget, if possible, any rumors or hearsay or anything I heard about it, * * *." Likewise Edward J. Abbott, the president, denied any knowledge of the renewed C.I.O. activity.

On September 20, 1940, about ten days after the above mentioned letters went out, James Abbott instructed Lucas to lay Champagne off, which Lucas proceeded at once to do. Lucas testified that he knew of no reason for the layoff and was surprised to receive the order. James Abbott could give Champagne no satisfactory explanation of the layoff. He testified that he had acted on orders from his father, Edward J. Abbott, and that all his father told him was that he had decided to lay Champagne off as a result of a conversation he had had with George F. Smith, the president of the Wilton Worsted Workers Association.

It was conceded by James Abbott that "there was no force reduction which necessitated the layoff of Champagne." In fact, James Abbott proceeded at once to fill Champagne's place by taking back Ray Brown who was admittedly not as good a weaver as Champagne.

Toward the end of October, 1940, the mill went from two shifts to three and a substantial increase of employment resulted. About this time Champagne applied to James Abbott to be taken back but was told there was nothing for him then. On several occasions, at intervals of two or three weeks Champagne renewed his application, without success. During that time Abbott was trying very hard to get good weavers, and indeed "actually went out to solicit some people to come to work." Some men were taken on who had never worked for respondent before. There seemed to have been something special about Champagne's case. Apparently James Abbott, as manager, had general charge of hiring, but though he needed good weavers, and Champagne was one of the best, when Champagne applied for reemployment James felt it necessary to refer the matter to his father, who told him not to take Champagne back.

By a letter from James Abbott dated January 9, 1941, Champagne was directed to vacate the company house which he had been occupying at a small rental. On the same day, apparently before Champagne had received this letter, he applied again to James Abbott to be taken back but was told that he wasn't needed just then and that he would be informed when he could be used. On January 11 James Abbott hired as a weaver a man named Callahan, who had never worked for the company before.

Respondent offered an explanation of the layoff. Beginning in 1938 the management had made a permanent change in manufacturing methods in the weave room, introducing automatic looms in place of box looms, which resulted in a reduction of operatives from over 60 to about 20. Early in September, 1940, according to Edward J. Abbott, Smith, the president of the W. W.W.A., came to him with a suggestion that the work in the weave room be rotated so as to equalize the employment in favor of other weavers who had been laid off for a considerable time. Abbott stated that he acceded to Smith's request and that upon his inquiry as to which weaver should first be laid off Smith named Champagne. The Board was rightly skeptical of this explanation. The alleged policy of rotating the work had never been discussed in meetings between the Association's executive committee and James Abbott, the management representative with whom the executive committee ordinarily conferred on Association matters. In fact, James Abbott testified that until he heard his father tes-

tify at the trial, he had not been advised that the reason for laying off Champagne was to equalize the work. No other employee was laid off, though several would have been eligible for layoff under the supposed policy, two of them having had a total of more hours' employment in 1940 than Champagne, and others having had substantially as much employment as Champagne had had during that year. Though Edward J. Abbott professed to be following the wishes of the Association in inaugurating this rotation policy, it appears that the management had no consultation with Smith in the matter of selecting the employee to replace Champagne. Furthermore, whatever excuse there might have been for rotation of work at the time Champagne was laid off, this does not explain the repeated refusals to put Champagne back to work after the employment increased due to the putting on of the third shift. As to this, all Edward J. Abbott could say was that he had been told by Smith that Champagne "had a job working somewhere else and usually in those cases we don't bother to take a fellow on again." However, he admitted that his son had told him that Champagne "had asked for his job back several times" and that he did not "expect Champagne to remain idle during the period of his layoff in order to be eligible for reemployment." At the trial Smith admitted that his real reason for persuading Mr. Abbott to lay off Champagne "was to keep Champagne out because he was not a member of the organization and get some of the members of the organization who were out of work back to work." He insisted, however, that he did not disclose this purpose to Edward J. Abbott, but proposed the rotation policy as the latter had testified.

Throughout the testimony of Edward J. Abbott and Smith there were many discrepancies and inconsistencies, some of which are pointed out in the Board's opinion. The Board was well warranted in rejecting as "not credible" their testimony that Champagne's discharge was the result of an agreement between them to institute a policy of rotating or equalizing the work. ▮▮ Respondent in its brief concedes that the Board was entitled if it chose "to refuse credence to the testimony of Smith and the two Abbotts" but insists that "once this has been done the record is barren of *any* evidence of the motive or reason for Champagne's layoff." We do not agree.

The Board was justified in relying on the circumstantial evidence of discrimination previously sketched in this opinion, and was not required to deny relief because there was no direct evidence that the two Abbotts knew of Champagne's recent activities in endeavoring to organize a C.I.O. local in opposition to the Association. National Labor Relations Board v. Link-Belt Co., 1941, 311 U.S. 584, 602, 61 S.Ct. 358, 85 L.Ed. 368. Smith must have known of this—his denial is utterly unworthy of belief—and it is a fair surmise, in view of the other circumstances of the case, that he discussed this development with Edward J. Abbott. However this may be, Lucas, the overseer, admittedly had heard of Champagne's organization activities, and in a small plant like the present one it is a reasonable inference that the information came to the notice of the higher management officials. The explanation of the discharge offered by respondent did not stand up under scrutiny. This fact in itself strengthens the inference drawn by the Board from the other facts in the case that the immediate cause of Champagne's layoff or discharge "was his renewed T.W.U.A. activity." We cannot say that the record lacks substantial evidence in support of the Board's finding.

A decree will be entered enforcing the order of the Board.