## NATIONAL LABOR RELATIONS BOARD v. J. G. BOSWELL CO. et al.

### No. 10148.

Circuit Court of Appeals, Ninth Circuit.

May 24, 1943.

Rehearing Denied June 18, 1943.

588

Robert B. Watts, Gen. Counsel, Ernest A. Gross, Howard Lichtenstein, and Malcolm F. Halliday, Associate Gen. Counsels, and Louis Libbin and William Strong, Attys., N.L.R.B., all of Washington, D. C., for petitioner.

Sidney J. W. Sharp and M. Wingrove, both of Hanford, Cal., for respondents.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

DENMAN, Circuit Judge.

Petitioner, herein called the Board, seeks our decree enforcing its order against J. G. Boswell Company, herein called the Boswell Company, and Corcoran Telephone Exchange, herein called the Exchange, with respect to their treatment of their respective employees and two labor organizations, Cotton Products and Grain Workers Union, Local 21798, herein called the Federal, and J. G. Boswell Company Employees' Association of Corcoran and Tipton, California, herein called the Association.

■ Federal filed with the Board the charges against the Boswell Company and the Exchange required for the making of the Board's complaint. Margaret A. Dunn, not a member of any union, also filed charges against her employer, the Exchange, concerning her discharge.[1] The Association was served with a copy of the complaint, and notice of the hearing, and thus became subject to the Board's jurisdiction in the proceeding, though it did not appear therein. National Labor Relations Board v. Sterling Electric Motors, Inc., 9 Cir., 109 F.2d 194, 210.

A. *Jurisdictional Facts.* Boswell Company, a California corporation, is engaged in California and Arizona in the business of growing and processing cotton and of manufacturing cotton seed products. Of the products manufactured and processed during the period from July 1, 1937, to June 30, 1938, at its Corcoran, California, plant, where the unfair labor practices occurred, respondent shipped to points outside California all the bales of cotton owned by it, numbering over 40,000, approximately 860 bales of linters, and 60 tons of cottonseed cake; during the same period it used at its Corcoran plant approximately 52,000 jute "patterns" imported from India and steel bands received from Alabama.

■ Upon the foregoing facts stipulated by counsel, the applicability of the Act

---

[1] Sec. 10 (b) of the National Labor Relations Act, 29 U.S.C.A. § 160 (b), provides that the Board may issue its complaint "Whenever it is charged" that anyone *is engaged in an unfair labor* practice affecting interstate commerce. The Board's regulations, Art. II, sec. 1, provides the charge may be filed "by any person or labor organization." The charged offense against interstate commerce is a matter of public concern and the Board's regulations properly recognizes the right of any person so to initiate proceedings to prevent its continuance. National Labor Relations Board v. Indiana & Michigan Electric Co., 318 U.S. 9, 63 S.Ct. 394, 87 L.Ed. ——.

to Boswell Company is not open to question. N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Santa Cruz Fruit Packing Co. v. N.L.R.B., 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; N.L.R.B. v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; N.L.R.B. v. Grower-Shipper Vegetable Ass'n, 9 Cir., 122 F.2d 368, 371. There is no merit in Boswell Company's contention that the charged unfair labor practices began in July just after the period for which the volume of interstate commerce was stipulated. It is elementary that the Board could infer that what had continued until June 30th would not cease in the following month.

The Exchange, a California corporation, is engaged in the telephonic communications business in Corcoran, California, where it provides to residents and business establishments the only available telephone service. Long distance calls to or from points outside the city of Corcoran or the State of California are effectuated through the joint facilities of the Exchange and the Pacific Telephone and Telegraph Company, a directly controlled subsidiary of American Telephone and Telegraph Company, which, pursuant to an agreement with the Exchange, maintains a cable of telephone wires connected to the Exchange's switchboard in Corcoran. At least three of the Exchange's subscribers—Boswell Company, Western Union Telegraph Company, and the Atchison, Topeka and Santa Fe Railroad—are engaged in interstate commerce. During 1938 the Exchange handled over 35,000 toll calls through the facilities of the Pacific Telephone and Telegraph Company; of this number there were 77 outgoing calls to points outside California and an undisclosed number of incoming calls from points outside the State.

■ The Exchange contends that its interstate communications are too small to confer jurisdiction upon the Board. Its position is without merit. The facilities of the Exchange are an integral part of the vast network of telephone lines which cover the entire nation. While these lines are owned by a large number of small telephone companies, such as the Exchange, they are operated as a unified system by virtue of physical connection of the lines and such operating agreements as are here involved.

The Exchange's facilities and lines are admittedly available and used for the transmission of interstate messages, both those originating and terminating within the Exchange's system. The Exchange is thus an instrumentality of interstate commerce, and as such is clearly subject to Federal regulation, irrespective of any showing as to the amount of interstate traffic actually using its facilities. Associated Press v. N.L.R.B., 301 U.S. 103, 128, 57 S.Ct. 650, 81 L.Ed. 953; Pensacola Telegraph Co. v. Western Union Telegraph Co., 96 U.S. 1, 9, 24 L.Ed 708; N.L.R.B. v. Central Missouri Telephone Co., 8 Cir., 115 F.2d 563; The Minnesota Rate Cases (Simpson v. Shepard), 230 U.S. 352, 390, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18. Moreover, respondent's interstate aspects assume greater importance by virtue of the fact that the Exchange furnishes the only medium of telephonic communication available to the business establishments of Corcoran, California. The Act "cannot be applied by a mere reference to percentages" (Santa Cruz Fruit Packing Co. v. N.L.R.B., 303 U.S. 453, 467, 58 S.Ct. 656, 661, 82 L.Ed. 954); it is applicable even though the interstate business "involve[s] but a small part of the entire service rendered by the" Exchange. Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 221, 59 S.Ct. 206, 213, 83 L.Ed. 126; N.L.R.B. v. Fainblatt, 306 U.S. 601, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014. Later in this opinion is considered the conduct of the Exchange as affecting interstate commerce, even though not engaged in such commerce.

B. *The Briefs.* As required by our rule 20, the Board's brief presents a statement of the facts supporting its findings with page references to the transcript, here consisting of seven volumes of 3343 pages. Our examination shows a meticulous accuracy in the correspondence of the record with the statement required by the rule and, because of its accurate and compact form, this opinion adopts such of its language as is pertinent.

■■ All that the Act requires to sustain the Board's findings is that they be supported by substantial evidence.[2] Our rule 20 simplifies the presentation of the respondents' case, both for the respondents and the court. If the Board's statement of

---

2 National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 342, 60 S.Ct. 918, 84 L.Ed. 1226, and a score of other cases.

fact is not sufficient to sustain the findings, the respondents' brief, in effect, may demur to it. If sufficient, it may be attacked by a showing that the portions of the record referred to do not support the Board's statement. All of the respondents' 250-page brief which presents evidence contra to that supporting the findings, and upon which we are asked to "pass upon the credibility of witnesses and the weight" of their testimony, is unnecessary and surplusage.

C. *The Unfair Labor Practices.* The Board found that respondent Boswell Company, in violation of Section 8(3) of the Act, 29 U.S.C.A. § 158(1), evicted seven employees from its plant and thereafter refused to reinstate them because of their membership and activities in Federal; that it dominated, interfered with, and assisted the formation and administration of the Association, in violation of Section 8(2); and that by the foregoing action and various anti-union conduct of its supervisory employees, the Boswell Company interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act, 29 U.S.C.A. § 157, thereby violating Section 8(1).

The Board further found that respondent Corcoran Telephone Exchange violated Section 8(3) and (1) of the Act by discriminating in the hire and tenure of employment of Margaret A. Dunn.

In addition to the usual cease and desist and posting provisions, the Board's order directed Boswell Company to offer reinstatement with back pay to the employees discriminated against, to place certain other employees upon a preferential hiring list, to afford all employees reasonable protection in the plant, and to refuse to recognize the Association as the collective bargaining representative of any of its employees. The order also directs the Exchange to reinstate with back pay Margaret A. Dunn.

The findings of a series of unfair labor practices by the Boswell Company are clearly supported by substantial evidence. From the many prohibited acts of Boswell Company so in evidence, some are hereafter stated. In this connection we find no support in the testimony for respondents' charge that the trial examiner failed to conduct an impartial hearing. His exclusion of certain evidence is not shown to have caused prejudice.

C (1). *The Boswell Company's coercion against the organizing activities of*

*Federal.* Federal, in July, 1938, through Organizer Prior, was continuing its attempt to organize the Boswell Company employees. After an organizational meeting, Tom Hammond, who supervised the operations of the gins and mill, and occasionally laid off and reemployed employees, bluntly informed Employee Andrade that Boswell Company would never tolerate or recognize a union, warned that Boswell Company would shut the mill in the event that a union gained a foothold, and pointedly inquired whether the Federal would feed Andrade if the mill closed. Joe Hammond had a similar supervisory position. Both Hammonds, in wholesale fashion, questioned employees about their union affiliations, the Federal, and its membership; advised them to seek employment elsewhere if they wanted to join a union; warned that union members would not be reemployed at the termination of the approaching seasonal lay-offs; and threatened to "lock up and shut the door" if Federal succeeded in organizing the plant.

On complaint to Gordon Hammond, the Superintendent over the entire plant, he refused to permit the posting of a notice in the plant to the effect that respondent Boswell Company would not discriminate against employees who wished to join the Federal.

These statements and conduct of Boswell Company's supervisory employees constitute well recognized forms of interference, restraint, and coercion in violation of Section 8(1) of the Act, and the Board properly so found. See e.g., International Ass'n of Machinists v. N.L.R.B., 311 U.S. 72, 76-80, 61 S.Ct. 83, 85 L.Ed. 50; H. J. Heinz Co. v. N.L.R.B., 311 U.S. 514, 518, 61 S.Ct. 320, 85 L.Ed. 309; N.L.R.B. v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 786; North Whittier Heights Citrus Ass'n v. N.L.R.B., 9 Cir., 109 F.2d 76, 78; N.L.R.B. v. Pacific Gas & Electric Co., 9 Cir., 118 F.2d 780, 788.

C (2). *The Boswell Company's evictions and refusals to reinstate members of Federal.* On the morning of November 18, 1938, Spear, Martin, Farr, Andrade, Wingo, Briley, and Powell, the officers and only active Federal members then employed by Boswell Company, appeared for work displaying their union buttons for the first time. At 10 a. m., Supervisor Bill Robinson suddenly turned off the power driving the gins, announcing that "We are going to shut the gin down for a little meeting outside." In response to queries from Farr and Mar-

tin concerning the nature of the meeting, Robinson explained that "it is about the union * * * we are going * * * to see whether we are going to have this union or not. We want everybody to go out there * * *."

In the presence of Supervisor Tom Hammond, Joe Hammond, Bill Robinson, Kelly Hammond, Oscar Busby, and Rube Lloyd,[3] the assembled employees in the yard staged an anti-union demonstration against Federal and its members. One employee proclaimed to Farr, "the company doesn't want your union here. I don't see why you fellows should turn agin' the company you are working for." Supervisor Lloyd shouted, "throw them [the union men] out." With the rallying cry that "the company is behind us," Lloyd's proposal was first echoed by another employee, and then acted upon by three men who seized Spear while he was explaining the purposes of Federal, and, accompanied by the remainder of the mob and supervisors, forcibly propelled him across the highway to Boswell Company's offices where they loudly demanded that the Federal men be discharged. General Manager Louis Robinson thereupon appeared and ordered the employees to return to work, promising to "straighten the matter out" presently.

Upon returning to their posts at the plant, the Federal members were prevented from working by the supervisors who shut off the independently controlled motors on their machines and directed them not to start operations. Farr's appeal for assistance to Tom Hammond, supervisor of the gins, fell on deaf ears. Finally, Supervisor Robinson, remarking that "it seems like either the union men run this or the non-union," advised the Federal members to leave; whereupon the members working in the gins left the plant and went to Farr's home, where the latter called General Manager Robinson to inform him of what had transpired. In reply to Farr's inquiry as to whether the men should return to work, Robinson stated that he would think the matter over and let them know.

Immediately upon their departure, Powell, the only Federal member employed in the yard, was called into the plant and ordered by Supervisors Robinson and Hammond to operate machines left vacant by the other Federal members, an assignment which he declined on the ground that he would be "scabbing on the Union." Bill Robinson thereupon warned Powell to remove his union button before the other employees noticed it and "scattered up the ground with him." Confronted with the alternative of renouncing his membership in Federal and "scabbing" or of being manhandled, Powell left the plant and joined the other members at Farr's home.

Without disputing the foregoing facts, Boswell Company seeks to evade responsibility for the evictions on the inconsistent grounds (1) that the Federal members acted unreasonably in voluntarily leaving the plant without consulting General Manager Robinson, and (2) that the men were ousted by the non-union employees, without authority from the company, because of resentment against their union activities. Both contentions are without merit.

After having been confronted with a show of force and prevented from working with the approval and assistance of the supervisors, Bill Robinson's "suggestion" to leave the plant must necessarily have been interpreted, as the Board states, "as a threat that further interference with their work, if not actual assaults, would ensue if they failed to comply therewith." Under such circumstances, the men clearly acted reasonably in avoiding further disturbances and possible bodily injuries by leaving the plant and immediately appealing to Manager Robinson. As the latter admitted in his report to Boswell Company's president, the Federal members were "run off the job."[4]

---

3 Kelly Hammond was the supervisor in charge of the night shift in the mill. Oscar Busby, the "foreman" in the machine shop, had from three to five subordinates and was regarded by General Manager Robinson as the top ranking employee in the shop. Rube Lloyd, the "building superintendent," supervised the work of the carpenters and construction employees to whom he gave working orders. Both Busby and Lloyd were salaried employees.

4 Powell was similarly justified in departing from the plant under threat of physical harm if he did not disassociate himself from Federal, a plainly illegal condition. Compare N. L. R. B. v. National Motor Bearing, 9 Cir., 105 F.2d 652, 658–659; N. L. R. B. v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 792, certiorari denied 312 U.S. 678, 61 S.Ct. 447, 85 L.Ed. 1118; Rapid Roller Co. v. N. L. R. B., 7 Cir., 126 F.2d 452, 460, 461. Thereafter, both Boswell Company

Respondent Boswell Company's contention finds no support in the record.[5] On the contrary, the undisputed evidence above outlined amply warrants the Board's findings that "representatives of the company initiated, led, and countenanced the entire anti-union demonstration" and were the "principal molestors of the Federal members."

There is abundant evidence of the failure to reinstate the evicted men. On being pressed to reinstate one of them, Superintendent Hammond stated to him, "Now, Lonnie, [Spear] you see what this union business has led to. You can't hope to put it over * * * if you will drop this union business you can come back to work." To another, whose place was vacant, he stated, "We can't use you at this time." To another, reinstatement was offered as soon as he, Powell, discovered that Federal was "all hooey" and "a bunch of fellows claiming something they couldn't back up." With the exception of Briley, none of the ousted employees, members of Federal, had been reinstated at the time of the Board hearing.

Another employee, Elgin Ely, joined Federal on November 11, 1938. The next day he discovered that his rate of pay had been reduced. When he asked his superior, Tom Hammond, the reason for the reduction, Hammond replied, "Maybe the union had something to do with it * * *. Maybe you should get your committee together and go up to the office and see if they couldn't find out something about it." On November 16th, Ely was excused from work because of an injured thumb which had become infected. Thereafter, he received a registered letter from Boswell Company, dated November 28th, to the effect that his machine had been shut down on November 26th and that his "employment by this Company terminated at that time." Because of the contents of this letter, Ely did not apply for reinstatement when he was released for work by his physician on December 2nd.

The registered letter was identical with that sent about the same time to the ousted employees. The medium of registered mail had never before been used by Boswell Company to notify an employee absent because of illness that he was being laid off or discharged. Moreover, the primary reason advanced by Boswell Company for sending such registered letters to the evictees, i. e., to notify them that the checks which they had been receiving while not performing any work would be discontinued, did not exist in the instant case since Ely's last pay check was for the week ending November 17th. The foregoing facts plainly indicate that Boswell Company considered Ely to be in the same class with the ousted Federal members and to merit the same discriminatory treatment.

Boswell Company's contention that no finding of discrimination against Ely may be made because he would in any event have been laid off on November 26th due to seasonal slack, is without merit. The record shows that in previous seasonal lay-offs, the men, including Ely, were reemployed upon application when their operations resumed. The unusual medium employed by Boswell Company to notify Ely of the termination of his job evidences a purpose to deprive him of his normal expectancy of reemployment after a seasonal lay-off. The Board properly concluded that, "in view of the entire background, the Company's acts of discrimination against the ousted employees, and its general antipathy to the Federal," Boswell Company intended by its registered letter to convey to Ely the impression that, as a member of Federal, the termination of his employment was final, and to "deter him from seeking reinstatement, upon recovering from his injury. The letter had this effect." By such conduct, whether characterized as a discharge or a lay-off, Boswell Company discriminated with respect to the hire and tenure of Ely's employment in violation of Section 8(3) and (1) of the Act.[6]

and Federal regarded Powell as being in the same category as the other evictees.

5 While it is true that Federal had requested Boswell Company to shorten the hours from 12 to 8 per day so as to spread the available work and thereby forestall further lay-offs, and that Boswell Company had apparently acceded to this request "to provide employment as long as possible," there is no evidence that non-union employees resented this fact.

6 In view of respondent Boswell Company's practice of reemploying its workers after seasonal lay-offs, there is no merit in respondent's further contention that Ely's employee status had been severed upon the cessation of his work on November 26th. North Whittier Heights Citrus Ass'n v. N. L. R. B., 9 Cir., 109 F.2d 76, 82, certiorari de-

C (3). *Boswell Company's formation and domination of a union of its employees.* Within a few hours after the eviction of the Federal members on November 18th, a group of employees, including Supervisors Lloyd and Busby, journeyed on company time to a neighboring city to secure information about the procedure for forming a union solely of company employees as a bulwark against an outside organization. That afternoon the supervisors reported their progress on this project to General Manager Robinson, informing him of their intention to hold a meeting at the plant that evening. Robinson tacitly approved their activities, "suggested" the procedure to be followed at the meeting, and delegated to its organizers full authority to prescribe the conditions for the return of the ousted Federal members.

About fifty employees and six supervisors attended the meeting held that evening at Boswell Company's office building. Supervisor Tom Hammond told at least one of his subordinates to be present. Supervisor Busby addressed the employees, stating that there was no reason why a "company union" would not "work" at the plant. After some discussion, blank sheets of paper were circulated and signed by employees and supervisors.[7]

Formal organization of the Association was perfected at a meeting held on November 28th, and attended by the same supervisors, at least four of whom signed the constitution. Supervisors Busby and Lloyd were elected vice president and a member of the labor relations committee, respectively. The remaining offices were filled by employees who, while not strictly speaking supervisors, held positions which identified them clearly with the management of Boswell Company rather than its ordinary plant employees.[8] Notices of Association meetings were freely circulated in the plant during working hours and at least one employee was warned by Supervisor Tom Hammond to attend the meeting "if you want to keep on working."

The Association presents the anomaly, according to its constitution, of existing for the purpose of collective bargaining with the Boswell Company in respect to all matters and "to not interfere with the right of any member or members to present grievances individually to the management." Association membership was limited to employees of thirty days' continuous service; membership on minor committees to employees of at least six months' service; and eligibility to office or to serve on the labor relations committee to those of at least one year's continuous service. Since the rank and file are seasonal employees, control of the Association's affairs, which was vested in a governing board comprised of the officers and members of the labor relations committee, was assured to the supervisors and those closely allied with the management.

Although claiming to represent 95 percent of the employees, the Association never requested exclusive recognition, never sought to bargain with the Boswell Company, and never attempted to secure a collective agreement; in fact, it did not even appoint the representatives empowered by the bylaws to discuss such matters with the Boswell Company. The only recorded request ever made by the Association occurred on April 5, 1939, after the bylaws were amended to provide that membership in the Association constituted a repudiation

nied 310 U.S. 632, 60 S.Ct. 1075, 84 L.Ed. 1402. The contention is in any event pointless since the Act prohibits discrimination against non-employees as well as those who are employees. Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217.

[7] One employee was accosted outside the meeting room in the presence of Superintendent Hammond with the suggestion that he "go in the office and sign that paper to keep this God damned A. F. of L. union out of here."

[8] President Hubbard was respondent's "farm adviser," with an office in the building housing other company officials. Performing no functions in connection with the operations of the plant, Hubbard's primary duty was to instruct foremen and contractors in farming operations. Treasurer Brenes was the Boswell Company's cashier and head bookkeeper with supervision over at least one assistant. Secretary Roberson was a clerical employee. The remaining two members of the important labor relations committee were McKeever and Willoughby,—the former an agronomist engaged in crop raising experiments, the latter the plant storekeeper. Like the supervisors and company officials, all received monthly salaries and were listed on respondent's Los Angeles pay roll as distinguished from the ordinary employees who received an hourly wage and were carried on the local pay roll.

of membership in any other labor organization. At that time Boswell Company was informed by letter that the Association had a number of unemployed members and was requested to "get in touch" with the Association when laborers were required. The association pointed out, however, that this was "merely a request" and that they were not "agitating for a closed shop." [9]

The Board's findings concerning the illegality of the Association and Boswell Company's conduct with respect thereto cannot be seriously challenged. Boswell Company's open campaign of interference and intimidation against Federal which culminated in the eviction of its officers and active members, contrasted with its subsequent acquiescence in the activities of the Association promoters on company time and property, reasonably indicated to the employees, as respondent admittedly intended it should, that the company was backing the project as a further counter measure against Federal. Moreover, the initiation and promotion of the Association by the same supervisors who took an active part in the campaign of intimidation against Federal, General Manager Robinson's participation in the preliminary plans and decisions, the use of company time and property, the participation as officers and members of supervisors and those reasonably regarded by the employees as representing the management, the presence of restrictive provisions in the constitution and bylaws, and the Association's complete inactivity as a bargaining agency,—all these constitute well recognized indicia and forms of domination and support.

In sum, formed under "conditions or circumstances which the employer created or for which he was fairly responsible and as a result of which it may reasonably be inferred that the employees did not have that complete and unfettered freedom of choice which the Act contemplates" (N.L.R.B. v. Link-Belt Co., 311 U.S. 584, 588, 61 S.Ct. 358, 361, 85 L.Ed. 368), the Association was "not a real bargaining agent or indeed an independent representative of the employees in any respect." N.L.R.B. v. American Mfg. Co., 2 Cir., 106 F.2d 61, 64, affirmed 309 U.S. 629, 60 S.Ct. 612, 84 L.Ed. 988. See also N.L.R.B. v. American Potash & Chemical Corp., 9 Cir., 98 F.2d 488, 494,

495, certiorari denied 306 U.S. 643, 59 S. Ct. 582, 83 L.Ed. 1043; N.L.R.B. v. Tovrea Packing Co., 9 Cir., 111 F.2d 626, certiorari denied 311 U.S. 668, 61 S.Ct. 28, 85 L.Ed. 429; H. J. Heinz Co. v. N.L.R.B., supra, 311 U.S. at pages 517-519, 522, 61 S.Ct. 320, 85 L.Ed. 309; Machinists case, supra, 311 U.S. at pages 75-78, 61 S.Ct. 83, 85 L.Ed. 50.

C (4). *The Exchange's discriminatory discharge of Mrs. Dunn and its coercive effect on Federal in seeking to organize the Boswell Company's employees.* The coercive anti-union acts of the Boswell Company created a general and disturbing interest in the town of Corcoran. That company financed one C. H. Glenn, who operated a 5200-acre grain and cotton farm. Glenn was president of the Exchange, having the only telephone plant serving Corcoran. On March 1, 1939, in the course of the Boswell Company labor troubles, Mrs. Dunn had been employed by the Exchange for fifteen years, the last thirteen as head telephone operator. The Board found that the Exchange discharged Mrs. Dunn in response to pressure of "a group of local citizens who sought Mrs. Dunn's discharge because of her alleged union sympathies and activity," thereby violating Section 8 (1) and (3) of the Act. There is evidence warranting the facts found by the Board, as follows:

Early in February 1939, Mrs. Dunn's daughter, Dorothy, was observed speaking to Federal members who were picketing the Boswell Company's plant in protest against its unfair labor practices; on subsequent occasions during the month, Dorothy and her sister, Margaret, were also seen talking to Federal Organizer Prior. The Dunn family soon began to receive information from local citizens that Dorothy was "in the wrong" with the people of Corcoran, particularly with Boswell Company's president, because she had been seen on the picket line, and that a petition was being circulated in Corcoran to induce the Exchange to discharge Mrs. Dunn because her daughters had been seen on the picket line and because of a belief that Mrs. Dunn was conveying to the pickets, through her daughters, information overheard at the Exchange's office. About February 15th, Mrs. Dunn, who was not a member of any

---

[9] It is significant that the only former Federal members who were employed after the evictions of November 18th were persons who joined the Association.

labor organization and had not transmitted messages to the pickets, questioned the president of the Exchange, Mr. C. H. Glenn, about the petition for her discharge. Glenn thereupon assured Mrs. Dunn that he had no intention of discharging her, that her work had been satisfactory for fifteen years, and that he was certain the charges against her were without basis. Perturbed by additional rumors to the same effect, Mrs. Dunn discussed the matter again with Glenn a few days later. On this occasion Glenn wanted to know whether it was true that her daughters "were going out with any of the men," referring to the Federal members.

On March 1st Glenn suddenly demanded Mrs. Dunn's resignation because "pressure was being brought to bear too heavily on him" and he "just couldn't stand what was being said * * * they were certainly awful." To Mrs. Dunn's inquiries as to whether these "awful" things reflected on her personal character or her work, Glenn replied, "absolutely not," and then asked whether her daughter Margaret was "keeping company" with Organizer Prior. Mrs. Dunn refused to resign.

Late that afternoon Mrs. Dunn's husband called upon Glenn and asked what he had against the Dunn family. Glenn, having his 5200-acre farm, first told Dunn about the "labor trouble" at the Boswell plant, explaining that this was the first step in an effort to organize all agricultural labor in the vicinity; he then pointed out that this "labor trouble" and Mrs. Dunn's discharge "all ties in together," that the Dunn girls had been seen speaking to the Federal pickets at the Boswell plant, that people were saying the girls were carrying messages from their mother, that "they" were very angry and were threatening to ruin Glenn's business unless he discharged Mrs. Dunn. Mr. Dunn thereupon accused Glenn of succumbing to community pressure because of his interests as a farmer.

The next morning, March 2nd, Glenn discharged Mrs. Dunn, informing her that she was ill, too old for the work, and that "there had been complaints made about the service." Realizing that he had previously made damaging admissions to Mr. Dunn respecting the true reasons for the discharge, Glenn then sought out Mr. Dunn and attempted to persuade him that his wife was discharged for the reasons assigned to her and not for those advanced the preceding day. During the conversation, however, Glenn admitted that nine men had called upon him and demanded the discharge of Mrs. Dunn.

█ At the hearing the Exchange contended that Mrs. Dunn was discharged because of (1) her physical condition, (2) her alleged habit of drinking wine while at work, (3) her alleged dissension with other employees, and (4) alleged complaints from subscribers about her work. In view of the fact that Glenn had been aware of Mrs. Dunn's physical condition for a long time without commenting thereon, that Glenn recognized that whatever dissension existed among the operators was probably due to his failure to instruct them clearly as to which one had supervisory authority, that he had received complaints about all the operators and recognized that faulty equipment was a chief cause of unsatisfactory service at that time, that he admitted in February and March, 1939, that Mrs. Dunn's work was satisfactory, and that he had first decided upon her discharge after her daughters' visits to the picket line, the Board was entitled to reject respondent Exchange's defenses as being without merit. Cf. N.L.R.B. v. Bank of America, 9 Cir., 130 F.2d 624, 628, certiorari denied April 19, 1943, 63 S.Ct. 992, 87 L.Ed. ——.

█ "The explanation of the discharge offered by respondent did not stand up under scrutiny. This fact in itself strengthens the inference drawn by the Board from the other facts in the case" (N.L.R.B. v. Abbott Worsted Mills, 1 Cir., 127 F.2d 438, 440), that in response to "pressure," the Exchange discharged Mrs. Dunn because of her alleged union sympathies and activities. A discharge of a non-union employee because of a mistaken belief that he was sympathetic to, or active in, a union violates Section 8(1) and (3). N.L.R.B. v. Link-Belt Co., 311 U.S. 584, 589, 590, 61 S.Ct. 358, 85 L.Ed. 368; N.L.R.B. v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 871, certiorari denied 304 U.S. 576, 58 S. Ct. 1046, 82 L.Ed. 1540. The fact that the alleged union activity extends "outside his own employment," is immaterial. Fort Wayne Corrugated Paper Co. v. N.L.R.B., 7 Cir., 111 F.2d 869, 874.

█ Nor is it material that there was no independent evidence to show that Mrs. Dunn was either discouraged (or encouraged) from joining a labor organization. The Board expressly found that Mrs. Dunn's discharge did discourage "member-

ship in the Federal as well as in labor organizations generally." Such discrimination necessarily discourages union membership—at the very least that of the discharged employees—and that therefore such discharge is ipso facto a violation of Section 8(3). Associated Press v. N.L.R.B., 301 U.S. 103, 129, 57 S.Ct. 650, 81 L.Ed. 953; N.L.R.B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 255, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217; N.L.R. B. v. Link-Belt Co., 311 U.S. 584, 589, 598, 600, 603, 61 S.Ct. 358, 85 L.Ed 368.

We hold that, even if the Exchange were not engaged in interstate commerce or an instrument thereof, nevertheless the Board was entitled to infer and hold that Mrs. Dunn's discharge was an unfair labor practice so affecting interstate commerce, in its purposefully discouraging effects on Federal's organization of the employees of the Boswell Company.

D. *The Board's Order.* The Board ordered the Boswell Company to "(a) Afford all its employees at all times reasonable protection in its plant in Corcoran, California, from physical interruption of their work and physical assaults or threats thereof directed at discouraging membership in or activities on behalf of Cotton Products and Grain Mill Workers Union Local No. 21798, A. F. L., or any other labor organization." Such a provision requiring Boswell Company to afford its employees reasonable protection in its plant from physical interruption of their work and physical assaults or threats thereof directed at discouraging union membership, is "adapted to the situation which calls for redress" (N.L.R.B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 348, 58 S.Ct. 904, 912, 82 L.Ed. 1381); it is plainly necessary to expunge the effects of Boswell Company's unfair labor practices and to "assure to [its] employees the rights which the statute undertakes to safeguard." Republic Steel Corp. v. N.L.R.B., 311 U.S. 7, 12, 61 S.Ct. 77, 80, 85 L.Ed. 6; International Ass'n of Machinists v. N.L.R.B., 311 U.S. 72, 82, 61 S.Ct. 83, 85 L.Ed. 50; N.L.R.B. v. Link-Belt Co., 311 U.S. 584, 600, 61 S.Ct. 358, 85 L.Ed. 368; Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 193-195, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217; N.L. R.B. v. Hudson Motor Co., 6 Cir., 128 F. 2d 528, 533. A similar provision was en-

forced in N.L.R.B. v. Ford Motor Co., 5 Cir., 119 F.2d 326, 328.

The Board also ordered the Boswell Company to "(d) Place James Gilmore, Boyd Ely, Walter Winslow, W. R. Johnston, Stephen J. Griffin, and Eugene Clark Ely upon a preferential list of its employees who are temporarily laid off, following a system of seniority to such extent as has heretofore been applied in the conduct of said respondent's business, and offer employment to them in their former or substantially equivalent positions, as such employment becomes available and before hiring other persons for such work."

These men were all members of Federal. In view of Boswell Company's multiple violations of the Act and strenuous hostility toward the Federal and its members, the Board properly concluded that there is grave danger that the employees in question may be refused reemployment so long as they remain members of Federal even if their former or substantially equivalent positions are available. This requirement is valid as a reasonable exercise of the Board's "informed discretion" as to the appropriate remedy necessary to expunge the effects of prior unfair labor practices. Phelps Dodge Corp., Machinists, cases, supra; N.L.R.B. v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 265, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. As the Eighth Circuit stated in upholding an identical provision in N.L.R.B. v. C. Nelson Mfg. Co., 120 F.2d 444, 447: " * * * We think that the Board was justified in holding as it did, that the respondent had engaged in some unfair labor practices. The Board exonerated the respondent from some of the charges but not all of them. Whether the requirement as to continuing the nineteen men [as to whom the Board had dismissed the complaint] on the preferential list would or would not 'effectuate the policies of the Act' was a matter peculiarly within the province of the Board to determine."

Boswell Company also contends that some of the employees are not entitled to reinstatement because they obtained substantially equivalent employment. Aside from the fact that the Board found upon substantial evidence that the new employment was not substantially equivalent to the old, respondent's contention is foreclosed by Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 196, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217. In accordance with

the ruling in the Phelps Dodge case, the Board has exercised its discretion on this question.

Respondents assert that the Board is guilty of "nonfeasance and neglect of duty," and that the order is void, because the Board failed to introduce evidence and make findings on the question of whether any of the employees made "any reasonable effort to obtain other employment." While it is true that the Board should order deductions from back pay on account of "clearly unjustifiable refusal to take desirable new employment," the matter of showing a basis for such deductions is an affirmative defense which must be put in issue by respondents and is in no sense a part of the Board's case. Phelps Dodge, supra, 313 U.S. at pages 199, 200, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217. Respondents do not contend that they were at any point precluded from "going to proof on this issue." No such issue was raised affirmatively by respondents either in their pleadings, at the hearing before the Board, in their exceptions to the Trial Examiner's intermediate report which recommended reinstatement with back pay, or in their briefs in support of said exceptions. Although the Phelps Dodge decision was rendered approximately six months before that in the instant case, respondents at no time contended before the Board that any employee had wilfully incurred losses which should be deducted. Not having objected on this ground when the matter was before the Board, respondents are now barred by Section 10(c) of the Act from raising the point. N.L.R.B. v. Bradford Dyeing Ass'n, 310 U.S. 318, 341, 60 S.Ct. 918, 84 L.Ed. 1226; N.L.R.B. v. National Motor Bearing Co., 9 Cir., 105 F.2d 652, 662; N.L.R.B. v. Grower-Shipper Vegetable Ass'n, 9 Cir., 122 F.2d 368, 378; N.L.R.B. v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 790, certiorari denied 312 U.S. 678, 61 S.Ct. 447, 85 L.Ed. 1118.

Respondent Boswell Company contends that it should not be required to reinstate Powell, even though he may have been discriminatorily discharged, because of his conviction for two felonies prior to his discharge. The record however shows that Powell's criminal record "was common knowledge among the people here, and everybody in the county knew about" it. In fact respondent Boswell Company was well aware of it as early as the Spring of 1938; yet it chose to retain him in its employ until the evictions in November 1938. Under these circumstances, Boswell Company cannot in good faith now urge Powell's earlier misconduct as a basis for its refusal to reinstate him. Stewart Die Casting Corp. v. N.L.R.B., 7 Cir., 114 F.2d 849, 855, 856, certiorari denied 312 U.S. 680, 61 S.Ct. 449, 85 L.Ed. 1119; N.L.R.B. v. Gamble Robinson Co., 8 Cir., 129 F.2d 588, 592.

Respondents complain of delay of the Board in consideration of the case and seeking enforcement of its order as affecting the accumulating back pay obligations. There is no showing whether the delay was caused by the Board's attorneys or those of respondents in securing extensions of time in preparing briefs or postponements of hearings. There is a presumption that the Board performed its duty. So far as concerns the Board's delay in seeking enforcement, respondents could have avoided their accumulating liabilities by petitioning this court under Sec. 10(f) of the National Labor Relations Act. Delays occur in court procedure, but interest is not denied on that ground. There is no merit in this contention of the respondents.

We decree the enforcement of the Board's order as prayed for.

MATHEWS, Circuit Judge (dissenting in part).

I agree that, in so far as it relates to J. G. Boswell Company, the order should be enforced, but think that, in so far as it relates to Corcoran Telephone Exchange, it should be set aside.