**IDAHO POTATO GROWERS, Inc., et al. v. NATIONAL LABOR RELATIONS BOARD.**

No. 10490.

Circuit Court of Appeals, Ninth Circuit.

June 30, 1944.

Concurring Opinion July 14, 1944.

Writ of Certiorari Denied Nov. 6, 1944.

See 65 S.Ct. 122.

E. A. Weston, of Boise, Idaho, for petitioners.

Alvin J. Rockwell, Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and David Findling and William F. Scharnikow, Attys., N. L. R. B., all of Washington, D. C., for respondent.

Before STEPHENS and HEALY, Circuit Judges, and FEE, District Judge.

STEPHENS, Circuit Judge.

Respondents in several cases on file with the National Labor Relations Board, all of which were consolidated in one complaint, were subjects of a cease and desist and affirmative action order. They are here as petitioners and " * * * pray this Honorable Court to review and set aside the decision and orders of the National Labor Re-

lations Board herein referred to and to grant petitioners such other and further relief as to the Court may seem just and proper." The Board has filed its answer and, in addition, requests us to make and enter our order of enforcement.

■ We have carefully checked the intermediate report of the hearing examiner with the evidence and find that it fully and fairly summarizes the relevant facts except where otherwise noticed. We have made some changes, have abbreviated relevant portions of this report and have eliminated argument. We adopt portions of it as abbreviated and changed and make such portions parts of this opinion although we set them out as notes. In reading these notes it should be kept in mind that "respondents" therein are the "petitioners" in this review. At times matters which are the subject of conflict in the evidence are stated in the notes as facts. This practice is followed because evidence favorable to the support of the Board's order, and not repudiated by the Board, and not wholly unbelievable must be taken by us as true.

Very briefly it may be said that produce men, petitioners here, buy or handle under contract a large portion of the great potato crop of Idaho. After the potatoes are dug, they are taken to a place for sorting, washing, grading and packing. Sometimes this readying for shipment is done in "cellars" on the farms and sometimes in the produce men's warehouses. The laborers who do this readying are crews employed by produce men and are called "warehouse and cellar" crews. In some instances the farmer assists in the readying. In a few instances the produce man also grows potatoes. In some instances persons working in the warehouse and cellar crews live in the vicinity of such activity and, when this seasonal work is over, go back to other employment or to the farms. Ownership in the produce remains with the grower until it is graded, and as to Idaho Potato Growers, Inc., ownership is unchanged until the dealer sells them. The cost of packing is sometimes borne by the grower.

A general statement of the case, including the name, abbreviated name, status of each party and of each organization concerned in the case, and the nature of the charge against each, is set out in note 1.[1]

---

[1] *Statement of the case.* The National Labor Relations Board, herein called the Board, by its Regional Director for the Nineteenth Region (Seattle, Washington), issued its complaint dated October 14, 1942, against Idaho Potato Growers,

A statement as to the nature and territorial extent of petitioners' activities is set out in

Inc., herein called Potato Growers; W. P. Wilson, herein called Wilson; L. S. Taube, Ted Taube, and L. B. Holden, co-partners, doing business as L. S. Taube & Company, herein called Taube; Meyer Friedman and Arthur E. Friedman, co-partners, doing business as S. Friedman & Sons, herein called Friedman; Idaho Falls Warehouse Company, herein called Warehouse Company; Rowenah O'Neil, administratrix of the estate of J. E. O'-Neil, deceased, both this administratrix and business predecessor being at times referred to herein as the respondent O'Neil;[i] A. G. Stuart, herein called Stuart; C. R. Holden and L. L. Holden, co-partners, do ing business as Holden Brothers, both this respondent and its predecessor firm Holden Brothers, Inc., being at times referred to as the respondent Holden; and Idaho Traffic Association, herein called Traffic Association.[ii] The complaint alleged that the respondents had engaged in and were engaging in unfair labor practices within the meaning of Section 8(1) and (5), 29 U. S.C.A. § 158(1, 5), and Section 2(6) and (7), 29 U.S.C.A. § 152(6, 7), of the National Labor Relations Act, 49 Stat. 449, herein called the Act, and that the respondents Potato Growers and Taube had each also engaged in and were engaging in unfair practices within the meaning of Section 8(3) and Section 2(6) and (7) of the National Labor Relations Act, 49 Stat. 449, herein called the Act, and that the respondents Potato Growers and Taube had

---

[i] Although J. E. O'Neil and Holden Brothers, Inc., are not parties respondent to these proceedings, at times in this Report they, as business predecessors to the respondents Rowenah O'Neil, administratrix of the estate of J. E. O'Neil, and L. S. Taube, Ted Taube, and L. B. Holden, co-partners, doing business as L. S. Taube & Company, respectively, for purposes of convenience only are included when reference is made collectively to "the respondents" and to "the respondent dealers." Whether the terms refer to the business predecessor depends in each instance on the time the respondents O'Neil and Holden began business operations as business successors of J. E. O'Neil and Holden Brothers, Inc., respectively. The extent to which J. E. O'Neil and Holden Brothers, Inc., are responsible for the unfair labor practices is discussed in note 7.

[ii] The first eight named respondents represent eight different cases, Idaho Traffic Association being also named as a party respondent in each of these cases. By a corrected order dated September 30, 1942, these cases were consolidated.

each also engaged in and were engaging in unfair labor practices within the meaning of Section 8(3) and Section 2(6) and (7) of the Act.

With respect to the unfair Labor practices the complaint as amended at the hearing alleged in substance: (1) that the respondents by and through the respondent Traffic Association and its executive secretary and others did on or about January 24, 1942, cause a meeting to be held at Idaho Falls, Idaho, of employees of the respondents Potato Growers, Wilson, Taube, Friedman, Warehouse Company, O'Neil, Stuart, and Holden, and the respondents and a number of farmers well known to them advised, urged, and warned said employees not to join or remain members of the Union, but to form an unaffiliated committee or union, and threatened to discontinue work of the employees if they joined or remained union members; (2) that on or about February 10, 1942, and thereafter, the respondents directly and through the respondent Traffic Association, its executive secretary, and a named attorney for the respondents in conversations and meetings with farmers and Grange representatives condemned the Union and collective bargaining contracts presented by it to the respondents and encouraged said persons to assist in opposing the Union; (3) that as a result of these activities of the respondents various local Grange and farmers' meetings were held during February and March 1942 at which statements were made and resolutions passed in opposition to the Union and threats made to boycott dealers who entered into agreements with the Union, said activities being publicized and circulated among employees of the respondents; (4) that on or about March 7, 1942, the respondents arranged a meeting of farmers and potato dealers, ostensibly for the purpose of allowing union representatives to explain the program of the Union, at which time statements were made and resolutions passed in opposition to membership of the respondents' employees in the Union and to collective bargaining with the Union, and threats were made to employees that there would be loss of work if they joined or remained members of the Union; (5) that in February and March 1942, and thereafter, the respondents made or caused to be made and published in newspapers circulated among the employees statements and press releases expressing opposition of the respondents, farmers, and Granges to employee membership in the Union and to the attempts at collective bargaining, threatening loss of work and disapproval of public opinion if such membership and at-

note 2.[2]  From this latter note it is appar-   ent that petitioners' business is both intra-

tempts were continued; (6) that the respective respondents Potato Growers, Wilson, Taube, Friedman, Warehouse Company, O'Neil, Stuart and Holden, beginning in January 1942, have urged and warned their employees to refrain from union membership; (7) that the respondents jointly and severally have failed and refused by specified acts to bargain collectively with the Union, as representative of the respective respondents' employees in appropriate units, although the Union at said times represented employees of each of the respondents in the appropriate units; (8) that the respondent Potato Growers on or about February 24, 1942, demoted a named employee to an inferior position and forced him to quit his employment, or discharged and refused to reinstate him because of his membership in and activities on behalf of the Union; (9) that the respondent Taube on or about February 5, 1942, discharged and refused to reinstate six named employees because of their membership in and activities on behalf of the Union.

The respondents, prior to the hearing, filed an answer in which they denied the commission of any unfair labor practices. They also allege that the units set forth in the complaint with respect to the respondents Potato Growers and Taube were not appropriate.

[2] *The business of the respondents.* All of the respondents except the Traffic Association, being herein at times called the respondent dealers, are dealers in potatoes in Idaho Falls, Idaho, and vicinity. The respondent dealers except the Potato Growers customarily buy lots of potatoes from other dealers and farmers in the vicinity, and pack, load, ship, and re-sell them. The respondent Potato Growers, being a cooperative enterprise, does not buy the potatoes in which it deals but ships them for the account of farmers, both members and non-members, and of other dealers with all of whom it ordinarily makes final settlement at the end of the season. All of the respondent dealers maintain warehouses and employ country crews in the Snake River Valley in the vicinity of Idaho Falls, Idaho. The specific operations of each are particularized below.

The respondents L. S. Taube, Ted Taube, and L. B. Holden, doing business as L. S. Taube & Company, are a copartnership with their principal office in Kansas City, Missouri. This firm maintains warehouses for the handling of potatoes at both Idaho Falls and Shelley, Idaho. It buys potatoes in the vicinity of these warehouses from both growers and dealers and re-sells them. During the 1941-42 season it sold and shipped from its Idaho Falls and Shelley warehouses approximately 1000 carloads of potatoes more than 90 percent of which were shipped to points outside the State of Idaho.

The respondent W. P. Wilson maintains a warehouse for the handling of potatoes at Firth, Idaho. Between 10 and 15 percent of the potatoes handled by him during the 1941-42 season consisted of potatoes grown by himself, the remainder of the potatoes handled by him during that period consisting of potatoes bought by him from other dealers and growers and re-sold by him. He sold and shipped from his Firth plant during the 1941-42 season approximately 450 carloads of potatoes, about 90 percent of which were shipped to points outside the State of Idaho.

Meyer and Friedman and Arthur E. Friedman are copartners, doing business as Friedman & Sons. This firm, whose main office is in Chicago, Illinois, leases and operates a warehouse at Idaho Falls for the handling of potatoes. It is generally engaged in the produce business in various States. In the course of its Idaho Falls operations it purchases potatoes from growers and other dealers. During the 1941-42 season it sold and shipped from its Idaho Falls warehouse approximately 360 carloads of potatoes, about 90 percent of which were sold and shipped to points outside the State of Idaho.

Idaho Falls Warehouse Company, an Idaho Corporation, among various business enterprises conducted by it at Idaho Falls, maintains a warehouse for the handling of potatoes. This respondent not only buys potatoes from growers and dealers for resale, but also at times acts as an agent in the handling of potatoes for growers. About 65 to 85 percent of the potatoes handled by it during the 1941-42 season were purchased by it for re-sale. During that season this respondent shipped approximately 700 carloads of potatoes, about 90 percent of which were sold and shipped to points outside the State.

Idaho Potato Growers, Inc., is a non-profit co-operative association, incorporated under the laws of the State of Idaho. This respondent sorts, packs, ships and sells potatoes for both its members and other growers. It also at times markets in carload lots potatoes acquired from other dealers. It carries on a substantial portion of its operations in the vicinity of Idaho Falls and Shelley, Idaho, and maintains a warehouse at each of these places.

Its method of handling potatoes is to find a buyer who offers to purchase pota-

state and interstate. In note 3[3] the hiring and handling of the employees in the cellar- warehouse crews, the work they do, how they do it, and where, is described.

toes at a stipulated sum and then by oral agreement with the grower or dealer to dispose of his potatoes to the buyer at the offered price less expenses incurred by the Potato Growers in the course of sorting, packing and handling them. At the end of the season this respondent makes settlement with the growers and dealers whose potatoes it has handled during the season. During the 1941-42 season the Potato Growers shipped approximately 1300[i] carloads of potatoes in the course of its operations in these vicinities. About 95 percent of these potatoes were shipped to points outside the State of Idaho.

Rowenah O'Neil is the duly appointed and acting administratrix of the estate of J. E. O'Neil, deceased. As administratrix she carries on the business of J. E. O'Neil in substantially the same manner as it was conducted by the latter before his death in August 1942.

O'Neil before his death and Rowenah O'Neil, administratrix, since that time have maintained a warehouse in Idaho Falls for the handling of potatoes. During the 1941-42 season he bought 800 to 900 carloads of potatoes from growers and other dealers, of which more than 90 percent was shipped and sold outside the State of Idaho.

A. G. Stuart owns and operates a warehouse at Shelley, Idaho. He handles in the course of his operations at Shelley potatoes grown by both himself and other growers. During the 1941-42 season about 95 percent of the potatoes handled by him was bought from other growers. During the season 1941-42 he sold and shipped approximately 200 carloads of potatoes, about 95 percent of which was sold and shipped to points outside the State of Idaho.

C. R. Holden and L. L. Holden, doing business as Holden Brothers, are a co-partnership. This firm, which came into existence in July 1942, owns and operates a warehouse at Idaho Falls where it handles potatoes and operates a general produce business. At the time this partnership was organized it acquired this property in Idaho Falls from Holden Brothers, Inc., an Idaho Corporation, which was liquidated in June 1942. C. R. Holden, L. L.

Holden, and an individual in New York were the sole stockholders in this corporation, which operated a produce business both in New York and in Idaho Falls. During the 1941-42 season this corporation sold 739 cars of potatoes acquired from growers, 610 of these cars being sent to points outside the State of Idaho. The corporation sold 129 carloads on the tracks at Idaho Falls for cash and the buyers sent most of the cars so purchased to points outside the State of Idaho. The Holdens operated the corporation's Idaho business and at or about the time of the liquidating of the corporation acquired the Idaho interests of the third stockholder. Since that time the co-partnership as described above has operated the same type of business as was conducted at Idaho Falls by the corporation.

Idaho Traffic Association is an Idaho corporation with its office at Idaho Falls. This corporation was organized in September 1941 for the purpose of rendering aid and assistance to shippers with respect "to traffic problems of all kinds, and matters arising out of the preparation, inspection, sale and shipment of merchandise and commodities of whatsoever nature." It has no stockholders, but issues memberships instead of stock. All the respondent dealers and about seven other potato dealers and shippers in the vicinity of Idaho Falls hold such memberships. For some time since prior to 1942 the Association has sponsored a luncheon meeting each Monday in Idaho Falls. Representatives of the member companies and some others have attended these meetings. Carl DeLong, executive secretary of the respondent Traffic Association, has usually presided at these meetings. Early in 1942 after the Union became active in Idaho Falls and asked the respondents and certain other potato dealers and shippers to bargain collectively with it as representative of their respective employees, as described in the following note 3, Eli Weston, counsel for the respondents, received an invitation to attend one of these meetings. He did so and the respondents and others present voted to retain him to represent them in labor negotiations. He later received a fee paid by a check of the Traffic Association.

3 *The status of the employees.* The respondent dealers handle potatoes which they acquire from farmers and other dealers. The employees who sort and pack potatoes for each of these respondents in the process of preparing them for market,

---

i This respondent shipped during the 1941-42 season a total of about 2500 carloads of potatoes in the course of its operations throughout the State of Idaho. Its manager testified that slightly more than half of these were from the Idaho Falls and Shelley operations.

## The Issues.

Four questions are set out in petitioner's opening brief as the issues. However, some of the questions include conclusions with which we do not agree, but we shall treat the issues as nearly as can be under the four queries.

(1) *Are the employees involved herein engaged as agricultural laborers?*

In Section 2, subdivision (3) of the Act [29 U.S.C.A. § 152(3)], it is provided that "the term 'employee' * * * shall not include any individual employed as an agricultural laborer * * *."

As has been noted the employees are grouped by the potato dealers into cellar-warehouse crews which go to different farms and to the dealers' warehouses and

except when performing certain odd jobs in the warehouse,[i] work in crews. The work done by the crews of each of these respondents is substantially the same. A crew, consisting of about eight employees, works at a sorter machine run by electric power. The employees on a crew usually consist of four employees known as sorters, one as a scooper, one as a jigger, one as a swamper, and one as a sack sewer.

After a dealer has agreed with a grower to buy or handle the latter's potatoes it is necessary to sort the potatoes according to grade and pack them for shipment. This work is performed either in the dealer's warehouse or in the grower's cellar by one of these crews which works at the sorter machine where it grades, weighs and sacks the potatoes. Most of such work as is done in the various warehouses of the respondent dealers takes place during a rush period of a few weeks in the fall of the year. Throughout the season considerable of such work is done in the growers' cellars. Approximately 90 percent of the potatoes handled by some of the respondent dealers are graded and packed in the country. If the work is done in the country it is necessary for either the farmer or the dealer to truck the potatoes to the dealer's warehouse or direct to railroad cars. If it is done in the dealer's warehouse the potatoes are then loaded on cars at the warehouse for shipment.

At times the potatoes are only partially sorted in the grower's cellar. In such instance, they are not graded and all of the culls are not removed, so there has to be a further sorting at the dealer's warehouse. At times also the potatoes are of such a quality that it is necessary for the respondent dealers to wash them at the warehouse before they will pass government inspection.

The respondents contend that the employees who sort and prepare the potatoes for shipment in the growers' cellars and the dealers' warehouses on the crews de-

scribed above are engaged in agriculture and that the Act does not give the Board jurisdiction over these employees. These crews, whether working in a farmer's cellar or in a dealer's warehouse, are under the supervision of the warehouse foreman. When working in a farmer's cellar they are under the immediate direction of a crew foreman who is also known as head sorter man. When work is to be done in a farmer's cellar a complete crew is usually sent by the dealer from the warehouse. At times, however, the dealer does not send a complete crew because the farmer himself works as a member of the crew and at times also has one or more farm hands work as members of the crew. Usually the dealer pays the wages of the crew members sent to the country by him, although on occasions the farmer pays them for the work done in his cellar. Except for the unusual cases when the farmer pays the crew, the dealer deducts from the sales price paid the farmer for the potatoes the amount paid the crew as wages in sorting and packing the potatoes.

The farmer at times is dissatisfied with the job of sorting being done by the crew and in such cases customarily registers his complaint with the crew foreman whether the complaint is directed to individuals on the crew or to the crew as a whole. Occasionally after a farmer registers his complaint the crew is stopped from working until a representative of the respondent dealer comes to the cellar and adjusts the complaint. There is no evidence that any member of a crew has ever been discharged because a farmer complained about the crew member's work. The authority to hire and discharge crew members finally rests with the foreman or managers of the respective respondent's warehouses, although crew foremen of country crews frequently are allowed to select their own crews. When the potato season begins each fall the respondent dealers customarily rehire upon application satisfactory crew members who have previously worked for them.

The Board found that the cellar and warehouse crews employed by the respondent dealers are not employed as agricultural laborers.

---

[i] The work of Milo Rash discussed infra is an example of such an odd job. Carloading and packing potatoes for special types of shipment are other examples of such work.

prepare the potatoes for movement into the market (see note 3). The Board contends that these employees are not exempt from the terms of the National Labor Relations Act as "agricultural laborers."

▮ Petitioners set out in full the United States Department of Agriculture's definition of agricultural labor and state that the Social Security Board would consider the employees involved in this case as "agricultural laborers" and that the "Victory Tax" is levied under the same definition. Several Idaho cases are also cited in the opening brief. It must be borne in mind, however, that the purpose of the statutes governing these federal and state activities are very different from the purposes of the so-called Wagner Act (National Labor Relations Act), with which we are here dealing. In determining whether or not the employees in the case are agricultural laborers, we must make a sharp cleavage in the basis of our reasoning. We must determine that all persons who perform labor, which is sometimes done, and which some years ago was habitually done, by the farmer, are agricultural laborers; or we must consider the purposes of the Wagner Act and hold that employees who are not working at farming, but who are specializing in

the preparation of farm products for trade or shipment after they have been reaped or gathered, are not agricultural laborers. In the cases of North Whittier Heights Citrus Ass'n v. N.L.R.B., 9 Cir., 109 F.2d 76, and N.L.R.B. v. Tovrea Packing Co., 9 Cir., 111 F.2d 626, we took the latter line of reasoning, and more particularly set it out in the opinions of those cases. We adhere to the reasoning followed in those cases.

▮ We think, essentially speaking, the laborers in the instant case occupy a similar status as the laborers do in North Whittier Citrus Ass'n v. N.L.R.B., supra, and N.L.R.B. v. Tovrea Packing Co., supra, and since we have seen by note 2 that petitioners are employed in interstate activities, it follows, and we so hold, that they are within the reach of the Labor Act.

(2) *May the petitioners be guilty of unfair labor practices if the same were committed by the growers and farmers or under their control?*

The heading to "Point No. 2" in the brief is different from (2) in the paragraph designating the issues. Its meaning, however, is essentially the same. A summarization of the evidence relating to the farmers' protest meeting is to be found in notes 4[4] and 7.

---

4 *The unfair labor practices. Opposition to the Union during its attempt to organize the potato workers; interference, restraint and coercion.*

In August 1941, Jack C. Hendricksen, an employee of the respondent Taube, had a conversation with Keyes Blair, "an executive of the Carpenters' Union." Blair suggested to Hendricksen that some of the employees of potato dealers attend a meeting of meat cutters and grocery clerks. Hendricksen and three other such employees attended such a meeting. Blair on that occasion explained to these employees how to start a labor organization. Two or three weeks later one Rosquist, an American Federation of Labor executive, called at Hendricksen's home and suggested to Hendricksen that petitions be circulated among those employees interested in forming a labor organization. Hendricksen, C. A. Falk and another employee of the respondent Taube caused such petitions to be circulated among employees of that respondent and also among employees of the respondents Potato Growers, Holden, and the Warehouse Company. In January 1942 Raymond L. Hansen, an organizer for the "Joint Council of Teamsters," came to Idaho Falls and began to organize the creamery workers in the vi-

cinity. Hendricksen and Falk, another employee of the respondent Taube, called on Hansen while he was in Idaho Falls and turned over to him some of the petitions which had been circulated among the potato growers. Hansen told these two employees that arrangements would be made for a meeting of the potato workers on January 16. An organizational meeting was held at that time.

News that the Union was organizing these workers soon spread among the respondent dealers and other dealers and also among the farmers in the vicinity of Idaho Falls. About January 20, after Milo Rash, an employee in the warehouse of the Potato Growers, had signed an application for membership in the Union, Fred Foreman, who had supervision over employees in the Idaho Falls warehouse of the Potato Growers, called Rash into the foreman's office. Rash's testimony was that Foreman asked him "what all this union business was about," saying that "several people of the different dealers" had telephoned that Rash was the instigator of it. Testimony of Swen Sorman, an employee of J. E. O'Neil at the time, in about January 1942 O'Neil's foreman, Lloyd Johnson, in the presence of Sorman and other O'Neil employees at the O'Neil

■ The premises upon which this query is based is not factually accurate. There is no doubt, however, that the farmers and growers were alarmed and that they opposed the unionization of the cellar-warehouse crews. It is the contention of petitioners that when it was known among the potato growers that a movement had started toward the organization of the crew members into a union to be affiliated with

warehouse in Idaho Falls, stated that O'-Neil and several others had retained an attorney who was "going to break the Union so the Union would never go through."

Thereafter, on the evening of January 23, 1942, Farrel L. Hansen, manager, Fred Gustafson, secretary treasurer, and E. S. Trask, a director of the Potato Growers, C. R. Holden, L. B. Holden, J. E. O'Neil, Carl DeLong, A. G. Stanger, manager of the Warehouse Company, and about 50 other persons, mostly farmers interested in the growing of potatoes, held a meeting in a hotel in Idaho Falls, to discuss the matter of the Union's drive to organize the potato workers. The farmers expressed concern over any possible increase in the wages of potato workers and asked the dealers present the nature of the employees' complaint. It was decided that a committee of farmers be appointed to invite a representative of employees from each potato dealer's warehouse to attend a meeting with the farmers next day at the Idaho Falls City Hall and discuss settlement of the difficulty. It was understood by those present that this discussion was to be for the purpose of attempting to adjust differences without the intervention of an "outside union." It does not appear from the evidence whether or how the committee issued invitations to the meeting to be held next day. All of the respondent dealers, however, asked certain of their employees to attend this meeting. Before the meeting on the afternoon of January 24, Manager Hansen of the Potato Growers told Ernest Norell and one or two other employees of that respondent about the meeting and said he wanted them to be present. About the same time Rash asked Foreman if he should attend the meeting to be held that afternoon. Foreman said, "Yes, I want you to go." Foreman also told Rash that he would be paid for time spent at the meeting. About noon the day of the meeting Warren Coon, buyer for the respondent Taube, went to a cellar in the country where a crew of that respondent's employees were at work. He announced the meeting to be held that afternoon at the City Hall and gave instructions that two members of the crew were to attend. He stated that wages would be paid as usual to those who attended. The crew selected two of its members, Willard Moore and Jack Hendricksen, to attend. Rash, Moore, Hendricksen

and the other respondent dealers' employees who attended this meeting were paid for their time so spent.

The meeting at the City Hall was attended by 60 to 70 people. Employees from dealers operating in the Idaho Falls, Shelley, and Firth areas, including employees of all the warehouses affected by this proceeding, attended the meeting. George Hersley, a farmer, presided at the meeting and informed those present of the fact that he and four other farmers who were present had been selected as a committee to talk to the employees and propose that they form a union of their own. He stated that "the carpenters and the laborers and everybody else" in the Pocatello area, which was near Idaho Falls, "had made a racket of labor unions and he sure didn't want that same condition to come to Idaho Falls." He said there was no need of letting their money get out of the State when they could keep it at home. He introduced one West. West stated that the community had always gotten along all right until "these God damned racketeers and agitators came in here" and caused trouble. Manager Hansen and Secretary-Treasurer Gustafson of the Potato Growers were both present at the meeting and spoke. Hansen stated, among other things, that the employees at the Potato Growers had always been one happy family until the Union had started trouble. Organizer Hansen testified that on this occasion Gustafson stated that a few years previous he and Manager Hansen had succeeded in getting the State legislature to enact a so-called "potato sorting bill"; that this bill caused an increase in employment for people who worked in sorting and packing potatoes; and that Gustafson and Manager Hansen would return to the legislature and obtain repeal of this law "unless conditions changed."

Manager Hansen and Secretary-Treasurer Gustafson further gave their support to these activities by the statements made at the meeting. They, Trask, C. R. and L. B. Holden, J. E. O'Neil and Carl De-Long further lent their assistance by helping plan the meeting. The respondents Potato Growers, Taube, and Warehouse Company lent assistance by asking certain of their employees to attend.

The Board found that by the remarks of Foreman to Rash as detailed above; by the conduct of Manager Hansen, Secretary-Treasurer Gustafson and Director

a nation wide union structure, the growers held meetings at which opposition was voiced; that feelings ran high; and that threats to stop raising potatoes and other threats were made. They contend that they are not accountable for acts of petitioners, which the Board sets up as unfair labor practices, as they were performed by petitioners under threats. Testimony upon this branch of the case is summarized in note 4, wherein also it appears that some of the petitioners appeared or sent representatives, and some members of the crews also attended. There is no doubt but that the petitioners were alarmed and impressed by the farmer opposition to the unionization of the cellar-warehouse crews, but this in no wise made the acts of the dealers any the less their own. "In fact nothing in the statute permits or justifies its violation by the employer." N.L.R.B. v. Star Pub. Co., 9 Cir., 97 F.2d 465, 470; N.L.R.B. v. Polson Logging Co., 9 Cir., 136 F.2d 314.

(3) *Are the petitioners L. S. Taube & Company and the Idaho Potato Growers, Inc., obliged to make the employees Willard Moore and Milo Rash whole, where the employees made no effort to return to work and where the employment was merely a seasonal or temporary layoff?*

This question is treated under "Point No. 4" of petitioners' opening brief.

▮▮ We recite in notes 5 [5] and 6 [6] respectively, the summarization of the evi-

---

Trask, L. B. Holden, and Manager Stanger in helping plan the meeting of January 24; by the speeches of Hansen and Gustafson at the meeting; and by the acts of the respondents Potato Growers, Taube, and Warehouse Company in asking certain of their employees to attend the meeting knowing its anti-union purpose, the respondents Potato Growers, Taube, and Warehouse Company interfered with, restrained, and coerced their employees in the exercise of the rights guaranteed in Section 7 of the Act, 29 U.S.C.A. § 157.

5 *The discrimination of the respondent Taube against Moore.* The complaint alleges that on February 5, 1942, the respondent Taube, terminated the employment of Willard Moore, Jack C. Hendricksen, Clency L. Wadsworth, C. A. Falk, Mervin Crandall and Harold Goodell because of their membership in and activity on behalf of the Union. The respondent Taube denies that these employment terminations were for union membership and activity, but contends that in making them it singled out those employees who were least capable. A total of eleven lay-offs were made at the time and the evidence shows that a decline in business necessitated such a number of lay-offs. The question is whether the six employees named above were singled out for inclusion among those to be laid off because of their union membership and activity.

Carl Metcalf, foreman of the respondent Taube's Idaho Falls warehouse, after conferring with L. B. Holden, prepared a list of those to be laid off on February 5. According to Holden, he told Metcalf at the time to keep efficient men on the job. Metcalf's attitude toward the Union is shown by the testimony of Wadsworth about a remark made by Metcalf in the presence of Wadsworth and other employees a week to ten days before these employment termina-

tions. On that occasion Metcalf said regarding the Union, "Now that you belong to the God damned Union do you feel any better about it?" L. B. Holden's participation in the meeting of January 23, which was designed to thwart the Union, has been discussed above.

Willard Moore, one of those whose employment Metcalf terminated on this occasion, began work for the respondent Taube in the fall of 1936. He worked for it every season thereafter until February 5, 1942, except for one voluntary lay-off from February until December 1941. Moore attended the Union's organizational meeting on January 16 and joined the Union. He attended and spoke at the meeting at the City Hall on January 24. Hersley, chairman of the meeting, stated that the Union would take money out of the State, and Moore answered this contention by stating that his experience as a member of a labor organization on the coast showed that "this condition did not exist." Moore also stated on this occasion that it should be possible for the Union and the dealers to come to an agreement which would improve the conditions of the employees "without hurting the dealer very much."

On the afternoon of February 5 after the eleven employees mentioned above had returned to the warehouse from work in the country, Metcalf told Moore and the others that he had orders from the office to lay them off. On the same crew with Moore was Hyrum Beck, a sorter hand. Beck had worked for the respondent Taube only since the spring of 1941. Also on the same crew were Cleo Teats, Milton Aller, and Dave Mahoney. Teats, a scooper, was working his first season for the respondent Taube; Aller, a jigger, and Mahoney, a cull picker, were working only their second season. Moore, who at the time was a cull

dence as to Moore and Rash. As to each of these employees the Board found that their dismissal was not simply a seasonal or temporary layoff, as indicated in the question, but that they had been discriminatorily discharged. We cannot say that there was an absence of evidence to support the finding. Where there has been a

picker, had also had experience at other types of sorting and also as a scooper and jigger.

The respondent Taube contends that it had no policy as to seniority and for that reason did not give weight to seniority in making these lay-offs. However, during the month of December 1941 before the advent of the Union this respondent similarly found it necessary to make eight lay-offs. All of those laid off at that time were working their first season at this respondent's Idaho Falls warehouse. Moreover, prior to the December lay-offs Metcalf conferred with Clifford Moore, a country crew foreman, as to what members of his crew should be laid off. Moore recommended that an employee on his crew who was working his first season be laid off. In February, however, Metcalf did not confer with Moore regarding the lay-offs to be made, although three employees from Moore's crew were at the time laid off, more than from any other crew. One of them was Willard Moore.

L. B. Holden, testifying as to why Moore was laid off, stated that he was one of the youngest men on the crew, and "a little slow on the table, possibly." Metcalf, who had supervision over the warehouse and country crews of the respondent Taube, was not called as a witness. Clifford Moore, Willard Moore's crew foreman, described the latter as a "good man in the crew." Metcalf did not consult with Foreman Moore during the 1941-42 season about the quality of work of Willard Moore. He visited the cellars where this crew worked during the season only three or four times and remained only 15 to 30 minutes on these occasions. At the time of the lay-offs Moore and Hendricksen, discussed below, asked Metcalf if their work was satisfactory and Metcalf replied affirmatively. L. B. Holden's activities to thwart the Union and Metcalf's remark made prior to these lay-offs in opposition to the Union have been stated above. Soon after the lay-offs the Union sought execution on behalf of its members of collective bargaining contracts with the various respondent dealers under circumstances detailed below. Metcalf about that time stated to a group of employees while at work that he didn't "think very damned much of the Union." Metcalf referred to the collective bargaining contracts as outrageous and stated that "anybody who signed a contract like that would be a damned fool." Of 48 employees in the re-

spondent Taube's Idaho Falls warehouse at the time of the February lay-offs all but five were members of the Union and all eleven of those laid off were Union members.

The Board found that in terminating the employment of Willard Moore on February 5, 1942, the respondent Taube discriminated in regard to his hire and tenure of employment and discouraged membership in a labor organization; that by such discrimination said respondent interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed them by Section 7 of the Act.

As to the alleged discrimination of the respondent Taube against Hendricksen, Wadsworth, Falk, Goodell, and Crandall the Board found that Taube did not discriminate as to hire or tenure of employment as to any of them in laying them off February 5, 1942.

6 *The discrimination of the respondent Potato Growers against Rash.* The complaint alleges that Rash was discriminatorily demoted and forced to quit his position or discharged on February 24, 1942. Rash began work for the Potato Growers in 1938. He did not return to work during the 1939-40 season, but returned in the fall of 1940 and worked until the date of the alleged discrimination. During his first season of employment Rash did sorting and miscellaneous work in the Idaho Falls warehouse. During the 1940-41 season he worked mostly on sorting crews both in the warehouse and in the country. At the close of the season in 1941, Manager Hansen sent for Rash and told him in the former's office that he was grateful for the work done by Rash during the season and he hoped Rash would return the following season as he would need him more at that time. In September 1941 Rash returned to work. It was the practice of the respondent Potato Growers to ship potatoes in bags known as brand bags and to use field bags, or dump bags, in the country as a temporary means of packing potatoes that had to be "re-run" in the warehouse. Soon after Rash began his employment in September 1941 Foreman assigned him the work of looking after these bags. This work did not require all his time, however, and when he was not busy looking after the bags Rash did other work such as helping the car-loader and packing bags and boxes of potatoes. Part of the time Rash was under the direct supervision of Foreman and at other times Les-

discriminating discharge, we do not understand that the "order to make whole" is dependent upon the discharged employee's application for re-employment. There is nothing in the record which indicates in the slightest that either Moore or Rash would not at any time have accepted reinstatement. As a matter of fact Rash did

ter Long, a foreman in charge of certain packing work in the warehouse, supervised · his work.

Rash attended the Union's organizational meeting on January 16 and immediately became active on its behalf. Foreman's interrogation of Rash soon thereafter about "this union business" and his statement to Rash that some of the dealers had said he was "the instigator of the whole business" has been detailed above. Foreman thereafter told Rash to attend the meeting at the City Hall on January 24 as detailed above. Rash was also elected a member of the Union's contract committee.

Between February 10 and 16, 1942, Owen sent separate letters to the various respondent dealers in which he requested meetings on behalf of the Union with these respondents for the purpose of negotiating collective bargaining contracts. A copy of a proposed contract was enclosed in each of these letters. The letter to the respondent Potato Growers and a copy of the proposed contract was sent to it on or about February 13. Soon after receipt of this letter and the proposed contract Manager Hansen called a meeting at this respondent's Idaho Falls warehouse of all employees at both its Idaho Falls and Shelley operations. Both Hansen and Fred Foreman, the supervisor of the Idaho Falls warehouse employees, attended this meeting. Hansen spoke suggesting to the employees that they would "get lots further lots quicker" by forming a labor organization of their own than by belonging to the Union. Rash stated in reply to Hansen that he did not think an organization of their own would give them as much power or support as affiliation with an international organization. Hansen stated, however, that he did not believe the employees would need such affiliation and said that if they would take up their problems with him and the Board of Directors he believed they could get whatever they wanted. He suggested that they take up their problems through a grievance committee. An election by written ballot was then held for members of such a committee in the presence of Hansen and Foreman. Rash and two other employees were elected to this committee, Rash being elected its chairman by receiving the most votes.

Thereafter on February 24, Foreman entered the "sack room" where Rash was at work and, although that date was not the end of a pay period, gave Rash his pay. Foreman said to Rash on this occasion, "Well, I guess that is all of it * * *. They have decided to discontinue your job * * *. The dumpers will put the sacks into the sack room and the truck drivers will take them out to the country crews." Foreman told Rash that the latter might be able to get work on a country crew. Rash protested that if he did so he would be unable to do scooping.

Soon after these events Manager Hansen told Organizer Hansen that Rash was not discharged, but was temporarily laid off and he would like to talk to Rash. Rash then called on Manager Hansen when Hansen was attending a meeting of the Traffic Association at a hotel in Idaho Falls. Hansen said to Rash on that occasion that he thought Rash was misled by the Union, but that he did not discharge him for union activities. Hansen said he would take up with the Potato Growers' board of directors the matter of putting Rash back to work in the warehouse and would let Rash know later. Hansen did not, however, offer Rash a position.

After Rash's employment termination Victor Mussman, a warehouse employee, was assigned to the work of handling the sacks. Mussman had begun work for the respondent Potato Growers only the preceding fall. Joe Schofield, another warehouse employee, at the same time was assigned to help look after the sacks. After about 2 days Lester J. Long, a foreman in the warehouse, was told by Foreman to take over the sack job, as the sacks were getting into such a state of confusion from improper handling that there might be trouble. Long accordingly transferred from other work in the warehouse to that of handling the sacks. Long still performs this work. The work consumes about two-thirds of his time.

Late in February or early in March after Rash's employment termination Manager Hansen called a meeting of the respondent Potato Growers' Employees in the Idaho Falls warehouse for discussion of whether it should allow the dealer O'-Neil to use part of the Potato Growers' warehouse for carrying on certain operations. Rash asked Hansen if he should attend this meeting as chairman of the grievance committee. Hansen told Rash there was no need of his presence, but that it would be all right if he wished to attend. Rash attended the meeting and asked Hansen before its conclusion whether he was

accept re-employment when offered to him. See Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 197–200, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217; New York Handkerchief Mfg. Co. v. N.L.R.B., 7 Cir., 114 F.2d 144, 147–148.

(4) *Were the petitioners justified in refusing to bargain with the union until the* union established its right to represent a majority of the employees?

This question is not numbered and is set out as a part of "issue (3)" and is treated in the brief under that number.

■ The evidence, see note 7,[7] does not support the suggestion made in this ques-

---

discharged. Hansen testified that Rash indicated on this occasion after inquiring as to his status that there were certain jobs he would not take; that Hansen asked if Rash thought himself "better than any of these other boys," and indicated the necessity of working with reduced force; that Rash then said, "I feel sorry for you, in fact, I feel so sorry I think I will pass the hat right now to get some money to help you out;" and that after this remark Hansen told Rash that in view of his attitude he had better look for other work. Rash did not deny this testimony by Hansen. The Board credits it.

As Rash's employment had already been terminated at the time of the remark about "passing the hat" for Hansen's benefit, it is obvious that he was not discharged for having made this remark. Hansen stated on cross examination an inability to recollect ever having offered Rash any specific job after his employment termination. Ernest Norell, a foreman of one of the respondent Potato Growers' country crews, testified that he told Rash after his layoff that the latter could work on Norell's country crew and that Rash could have had work on the crew "if he wanted to scoop." Rash denied that Norell offered him a job. In any event Foreman, who was Norell's superior, told Norell about that time to have Rash do "scooping or something" if he went on the crew. Whether Norell offered Rash a job on the latter's country crew is not free from doubt. It is clear, however, that if he did so the offer was confined to a scooping job.

Hansen testified that before Rash's employment termination he told Foreman to attempt, on account of decreased business, to reduce the pay roll and combine operations. He testified that he suggested Long as being able to do Rash's work.

Scooping paid 5 cents an hour less than Rash's former position, which was still continued as part of the operations of the respondent Potato Growers, Rash was not offered substantially equivalent employment.

The Board found that on February 24, 1942, the respondent Potato Growers discriminated in regard to the hire and tenure of employment of Rash and discouraged membership in a labor organization; that by such discrimination said respondent in-

terfered with, restrained, and coerced its employees in the exercise of the rights guaranteed them by Section 7 of the Act.

[7] *The refusals to bargain; other interference, restraint, and coercion.* (1) *The arrangement of the respondent and other dealers to handle their labor problems through the Traffic Association.* Meanwhile, after the letters and proposed contracts mentioned above had been mailed to the respondent and other dealers on behalf of the Union, Manager Hansen and Eugene Trask, a director of the Potato Growers, asked Eli Weston, an attorney at Boise, Idaho, to come to Idaho Falls in order to discuss with the potato dealers their labor problems. On February 16, 1942, Attorney Weston attended a meeting sponsored by the Traffic Association in Idaho Falls. The respondents and other dealers who were present, voted to retain Weston and to contribute to a fund for his payment. The voted contributions were made accordingly, most of them being deposited with funds of the Traffic Association and paid Weston by DeLong, its executive secretary.

(2) *The appropriate units.* The complaint alleges that all employees of the respondent Potato Growers on its cellar and warehouse crews at Idaho Falls and Shelley, of the respondent Taube on its cellar and warehouse crews at Idaho Falls and Shelley, of the respondent Wilson on his cellar and warehouse crews at Firth, and of the respondent Stuart on his cellar and warehouse crews at Shelley, and of all the other respondent dealers on their respective cellar and warehouse crews at Idaho Falls exclusive of office employees and supervisory employees of higher rank than cellar crew foremen, constitute, in the case of each of said respondents, a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act. 29 U.S.C.A. § 159(b). The answer, as amended at the hearing, admits the appropriateness of the units as alleged except with respect to the respondents Potato Growers and Taube.

The Idaho Falls and Shelley warehouses of each of these respondents are under separate supervisors. The supervisor of each of these warehouses, however, is responsible to a manager who has an office in the plant at Idaho Falls, which is about 8

tion that petitioners refused to bargain because it was not shown that a majority of the employees in any of the appropriate bargaining units had authorized the union to bargain for them. The whole case indicates that this question was not a moving factor in the difficulties. It is apparent that petitioners were opposed to the

miles from Shelley. The Shelley foreman of each, as a practice telephones "his" manager in Idaho Falls repeatedly every day about business matters at the Shelley warehouse. The general nature of the work performed by the warehouse and cellar crews at Idaho Falls and Shelley is the same. Occasionally, employees are exchanged between the warehouses of each of these respondents in the two places. That Manager Hansen viewed the employees of the respondent Potato Growers at Idaho Falls and Shelley as one group with common interests as to matters of labor organization is shown as set forth above by the fact that in February 1942, he called to one meeting employees of both the Idaho Falls and Shelley warehouses of that respondent at which he urged them to start a union of their own. The Union has members in both the Idaho Falls and Shelley warehouses of these respondents.[i] It is the only labor organization, moreover, which has members among the employees in any of these warehouses.

The Board found that at all times material herein the employees of the respondent Potato Growers on its cellar and warehouse crews at Idaho Falls and Shelley, of the respondent Taube on its cellar and warehouse crews at Idaho Falls and Shelley, of the respondent Wilson on his cellar and warehouse crews at Firth, and of the respondent Stuart on his cellar and warehouse crews at Shelley, and of all the other respondent dealers on their respective cellar and warehouse crews at Idaho Falls, exclusive of office employees and supervisory employees of higher rank than cellar crew foreman, constitute and constituted in the case of each of said respondents a unit appropriate for the purposes of collective bargaining, and that said units insure to the employees of each of said respondents the full benefit of their rights to self-organization and to collective bargaining and otherwise effectuates the policies of the Act.

(3) *Representation by the Union of a majority in the appropriate units.* It was stipulated at the hearing that the Union had been designated as representative for the purposes of collective bargaining of a majority of the employees on pay rolls of the respective respondent dealers in or

about February 1942 in each of the units found to be appropriate.

The Board found that in or about February 1942, and at all times material thereafter, the Union was designated and selected by a majority of the employees of the respondent dealers in the units found to be appropriate and pursuant to Section 9(a) of the Act, was at that time and at all times material thereafter, and now is the exclusive representative of the employees in each of said units for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment.

(4) *The refusals to bargain.* Important in the vicinity of Idaho Falls is the Grange, a well known farmers' organization. The Grange members and other farmers were concerned about the attempt to unionize the potato workers because, they contended, labor costs are ultimately paid by the farmer. Soon after the proposed contracts were sent to the respondent and various other dealers on behalf of the Union as stated above, a meeting of so-called local Grange masters and others took place in a hotel in Idaho Falls. Manager Hansen and Director Trask of the respondent Potato Growers attended this meeting. Attorney Weston was also present. It was agreed on this occasion to hold "a general growers meeting" in order to explain the proposed Union contracts and the developments with respect to unionization of the potato workers. Such a meeting took place on February 23, 1942, in York Grange Hall, a meeting place near Idaho Falls. Weston was present and explained the nature of the contracts presented the dealers. Some statistics prepared by Manager Hansen regarding how the Union contracts would increase labor costs were read at the meeting. The group voted a resolution which recited, among other things, that those present at the meeting protested the entering into any contracts between dealers and the Union unless the farmers in the vicinity were allowed to participate in the negotiations; also that the farmers should be represented and allowed to present evidence in case the matter went before the Board. Those at the meeting further passed a motion unanimously "that all growers and producers in this area refuse to ship or send potatoes or produce to any packer or shipper who signs the contracts discussed at the meeting."

Several other similar meetings of the Grange and other organizations were held

---

[i] The Union has as members a majority of the employees in the combined Idaho Falls and Shelley plants of each of these employees, but not in the Shelley plants alone.

union affiliation of their crew members. If they had any doubt about the majority status, it would have been very easy to have demanded proof upon this union claim. If a majority had been found lacking, the whole trouble would have been over.

The Board, except as to a minor matter, adopted the Examiner's findings as its findings and issued its order. In our study of the case we have gone carefully over it as a whole but have treated only the points raised in this opinion. We are

---

in the vicinity soon after the York Grange meeting. Manager Hansen testified that he attended and spoke at several of these meetings and that he attempted at such times to organize the growers so that they could "put themselves in position to properly represent their interests in the case or cases where any costs of wages were under consideration that would affect the prices they receive for their potatoes." Hansen's activities encouraged farmer opposition to the Union. On March 2, 1942, Organizer Hansen, Owen, and others representing the Union, met with Weston, representing the respondent dealers. Weston mentioned the York Grange meeting and the other meetings being held by the Grange as showing the attitude of the farmers. He stated that in order to negotiate, it would be necessary for the Union "to recognize" the Grange. A similar meeting was again held the next day, Manager Hansen also attending this meeting. Weston and Manager Hansen reiterated the position taken by Weston the preceding day. Manager Hansen also said that he did not see why the Union undertook to organize the community's potato workers, as the community was devoted to agriculture and was getting along "very good" without the Union. Owen stated at this meeting that he would like to talk to the farmers, as he understood they had an erroneous idea of the Union's contract demands. Weston and Manager Hansen stated that they thought they could arrange such a meeting and the former agreed to invite those who were to attend.

On March 7, 1942, the proposed meeting was held, attended by 60 to 70 persons. Weston presided and several of the respondent dealers were represented at this meeting. A number of the employees were there. Owen spoke, undertaking to state the purposes of the Union and the nature of the proposed contracts. Several growers also spoke at this meeting. J. E. O'Neil spoke, stating to Owen in the presence of the group, " * * * what in the Hell have you ever done for your country; why in the Hell don't you get a gun on your back instead of causing trouble on others, * * *." Manager Hansen also spoke, stating that the Potato Growers' sorting costs had risen from eight to fifteen cents a hundred because of lack of interest of his employees since union activity began. The meeting finally broke up during an ar-

gument between Owen and O'Neil. The farmers and dealers, however, remained for further discussion after the meeting.

On Sunday, March 8, 1942, Weston wrote a letter to Owen, stating that the dealers were perhaps in a worse predicament than before the meeting of March 7. He stated that he planned to attend the regular meeting of the dealers the next day, however, when a decision would be made as to "the farmer matter." Weston stated that he would advise Owen as to progress made at that meeting. Meanwhile on March 4, Owen wrote the respondent Wilson reminding him of the proposed contract previously mailed, stating that under the Act it was a duty to negotiate within a reasonable time with a union which represented 51 per cent or more employees, and asking him his position with reference to negotiating. Wilson replied that the dealers as a group had turned the matter over to Weston and he understood that Weston was in communication with Organizer Hansen. On March 10, Owen sent letters like that sent Wilson to the other respondent dealers. On Monday, March 16, Weston wrote Owen that he had been unable to attend the dealers' meeting that day in Idaho Falls, although he had expected to do so. Weston stated that he favored considering the various contracts individually and that, although he had unstood that upon failure of Owen to convince the farmers at the "last meeting" the dealers were to be for the time relieved of negotiating, he would communicate with Owen as soon as he heard from the dealers about further negotiations. Weston indicated that there were three or four dealers with respect to whom he questioned the Union's majority, and he would later submit the names of those dealers to Owen. No such names were ever submitted.

On March 18, Organizer Hansen and Owen had another meeting with Weston. Weston suggested that since he was located at Boise, Idaho, negotiations be conducted by mail. Hansen and Owen refused to consider favorably this suggestion. Weston again questioned whether in the case of certain dealers the Union had a majority, but did not name any of the respondent dealers. Hansen indicated the Union was willing to submit proof of majority whenever negotiations began. The three discussed the question of the order in which possible negotiations should be

convinced both as to fact and as to law that the evidence supports the findings, and the order runs logically from the findings. Briefly the order is as follows:

1. The respondents, Idaho Potato Growers, Inc.; W. P. Wilson, L. S. Taube, Ted Taube, and L. B. Holden, co-partners doing business as L. S. Taube & Company; Meyer Friedman and Arthur E. Friedman, co-partners doing business as S. Friedman & Sons; Idaho Falls Warehouse Company; Rowenah O'Neil, administratrix of the Estate of J. E. O'Neil, deceased; A. J. Stuart; C. R. Holden and L. L. Holden, co-partners doing business as Holden Brothers; and Idaho Traffic Association, where

conducted, Hansen and Owen urging that they should proceed according to the order in which the contracts had been presented, but Weston urging that the Potato Growers' negotiations should be conducted first. Owen asked if the dealers would consider an election covering the employees of all dealers in the area. Weston replied that he thought not, but that he would discuss the matter with the dealers and advise Owen of the result.

On March 23, Weston wrote Owen from Boise, stating that he had attended a convention of the Traffic Association at Twin Falls, Idaho, the preceding Saturday and had been unsuccessful after the meeting that night in an attempt to call together a quorum of a Committee on labor problems. He stated that he told those to whom he talked about the Union's insistence upon having further negotiations. Weston stated as to the order of negotiations that he believed the dealers'. position to be the better one "inasmuch as we should eliminate all questionable cases involving the 51 percent rule before we proceed with the others." He suggested the possibility of getting an "advisory opinion" from the Board about the law with respect to the necessity of "bargaining for the entire industry." Weston stated an intention of seeing Owen on March 26 or 27 after the meeting with a labor committee of the dealers, but did not communicate with Owen on either of those dates. On March 31, Weston wrote Owen another letter in which he stated that he had been unable to get the labor committee together for a meeting, but that he would be in Idaho Falls again the next day. The letter stated that Weston would discuss matters with the committee and notify Owen "just as soon as we can arrange a meeting." Owen did not hear from Weston the next day, but a few days later received a copy of a letter dated April 3 in which Weston's secretary wrote Manager Hansen that Weston was ill in bed and could not attend the Monday meeting, presumably of the Traffic Association. Also on April 3, Owen wrote a letter to Weston in which he stated that in the meetings held there had been no negotiations in good faith, that he saw no reason for further meetings until the Union was shown that there would be such negotiations. The letter

stated that charges of refusal to bargain were being filed with the Board. Owen filed such charges in April.

The 1941-42 potato season ended soon after these charges had been filed and there were no further dealings between representatives of the Union and the respondent dealers respectively until October 5, 1942. On that date Organizer Hansen and Owen met Weston who said that there was a possibility some of the dealers could meet with the Union representatives. Weston asked Owen and Hansen if they could prove a majority for the Union. They assured him they could and Owen stated they would claim it as of the date the proposed contracts had been presented. Organizer Hansen about that time also talked to C. R. Holden about the possibility of discussing the situation with some of the dealers. Such a meeting took place on October 7. At this meeting Owen, Organizer Hansen, and International Representative Al May were present for the Union. Manager Hansen of the Potato Growers, L. B. Holden of Taube, C. R. Holden of Holden, A. G. Stanger of the Warehouse Company, DeLong of the Traffic Association, and Wilson were present from among the respondents. On this occasion there was discussion of the wages being paid potato workers in the locality, the dealers explaining that labor pirating was causing wage increases. The Union representatives stated that the Union could be of assistance in stopping pirating. There was also discussion about "show-up time" and whether the dealers would be willing to pay employees for time spent in traveling between the warehouses and the cellars. Weston asked the Union representatives why they wanted such a lengthy agreement and Owen replied that it would be possible to write a two paragraph contract which would be satisfactory to the Union. The respondent dealers represented at the meeting inquired whether the Union would accept a wage and other items which the dealers had agreed to among themselves. They asked the Union representatives to submit the proposal to the Union membership. The proposal was presented to the membership at a meeting on October 9 and the members did not agree to accept the proposed wages because of the disparity in wages that were

acting as agent for or in the interest of any of the other respondents; and their re-

spective officers, agents, successors, and assigns, shall:

being paid in the Idaho Falls and Shelley areas.

On October 12 Owen, May, and Organizer Hansen met with Weston. They presented him with a proposed contract. Weston called attention to the length of the contract and said he had understood the Union would be satisfied with a two paragraph agreement. Owen replied that the document was something on which to start, and "probably could be cut down." Weston raised no other substantial objection to the document except to a closed shop clause, and the Union representatives expressed a willingness to delete or modify it. They also explained their version of how the Union could assist to stop pirating, provided it was given the check-off. The Union representatives stated that the Union could then issue termination slips whenever employees left their employment and prevent pirating by requiring the employees affected to report at the Union's office before receiving other employment. During the meeting of October 12 Weston agreed to submit a counter-proposal to the Union's proposed contract. He never did so. Organizer Hansen suggested that the Union representatives be allowed to meet with the dealers at the next Traffic Association meeting on Monday, October 19, and those dealers who wished to negotiate a contract with the Union could do so. Hansen and Weston thereafter arranged for such a meeting.

On Saturday before the proposed meeting of October 19 Weston telegraphed Organizer Hansen that DeLong was in the hospital and C. P. Holden and Manager Hansen had gone to Washington "on the price ceiling." The Union representatives and the dealers did not meet on October 19. On October 24, Weston wrote a letter to Owen in which he stated that the Union never had proved its majority and that the respondent dealers took the position there should be a certification "as of this date or as of the date of the filing of the Complaint and not as of February, 1942." The letter stated that the respondent dealers did not deem themselves obliged to bargain until proof of majority by certification or otherwise. About the time of sending the letter Weston saw Organizer Hansen, telling Hansen that he was recommending to the respondent dealers that they proceed with the hearing and that he saw no use of further negotiations. About the same time Weston similarly told Owen and May that the respondent dealers "were going to go on through with the hearing," and there was no use of further negotiations, although he believed an agreement could be reached if the hearing was

postponed. Owen suggested that it should be possible to negotiate an agreement before the hearing. Weston replied that he had no time to meet as he would be busy preparing for the hearing.[ii]

There have been no further dealings between the Union and the respondents. It should be noted, however, that apart from their dealings with the Union each of the respondent dealers gave wage increases to their employees about the time the Union began to organize the potato workers in January 1942, and further increases thereafter in April or May. All of them except the respondent Friedman, who had not yet resumed operations during the 1942-43 season, also have given wage increases since the opening of this season. The wages now paid as a result of these increases approximate those contained in the proposed contract submitted by the Union on October 12.

The Board found that the respondents Potato Growers, Wilson, Taube, Friedman, Warehouse Company, Stuart and each of them refused to bargain collectively with the Union on or about March 2 and 26 and April 1, 1942, as the representative of their respective employees in the appropriate units in respect to rates of pay, wages, hours of employment and other conditions of employment and have thereby interfered with, restrained, and coerced their employees in the exercise of the rights guaranteed by Section 7 of the Act, and that these respondents and also the respondents Holden and O'Neil refused similarly to bargain collectively with the Union on or about October 24, 1942, and thereafter, and that by such refusal to bargain, by Metcalf's remarks concerning the Union and the proposed collective bargaining contracts submitted by it, by Manager Hansen's statement to Rash that he thought the latter was being misled by the Union, by his speech on March 7, his deprecation of the Union and suggestion that the respondent Potato Growers' employees form a labor organization of their own, his actions and those of Foreman concerning the election of a grievance committee by the employees of respondent Potato Growers, his speeches to the farmers at the Grange and other meetings as detailed above, and by the unilateral wage increases, the respondent dealers have interfered with, restrained, and coerced their employees in the exercise of the rights guaranteed by Section 7 of the Act.

ii The findings regarding the meetings and communications between the respondents and the Union are based on the testimony of Owen and Organizer Hansen.

a. Cease and desist from:

(1) Refusing to bargain collectively with Teamsters, Chauffeurs, Warehousemen & Helpers, Local 983, affiliated with the American Federation of Labor, as the exclusive representative of the employees of the respondent dealers in each of the units found above to be appropriate for the purposes of collective bargaining;

(2) In any other manner violating rights guaranteed by § 7 of the Act.

b. Take the following affirmative action:

(1) Bargain collectively with Teamsters, Chauffeurs, Warehousemen & Helpers, Local 983, affiliated with the American Federation of Labor;

(2) Post immediately certain notices in conspicuous places in the respective warehouses of the respondent dealers in Idaho Falls, Firth, and Shelley, and in the place of business of the Idaho Traffic Association in Idaho Falls, and maintain for a period of at least sixty (60) consecutive days from the date of posting, notices to employees of the respondent dealers stating that the respondents will not engage in the conduct from which they are ordered to cease and desist in paragraphs 1, a, (1) and (2) of this Order, and that they will take the affirmative action set forth in paragraph 1, b, (1) of this Order;

(3) Notify the Regional Director of steps taken to comply with the Order.

2. The respondents L. S. Taube, Ted Taube, and L. B. Holden, co-partners doing business as L. S. Taube & Company, and their agents, successors, and assigns, shall, in addition:

a. Cease and desist from discouraging membership in Teamsters, Chauffeurs, Warehousemen & Helpers, Local 983, affiliated with the American Federation of Labor, or in any other labor organization of their employees, by discharging or refusing to reinstate any of their employees or in any other manner discriminating in regard to their hire and tenure of employment or any term or condition of their employment.

b. Take the following affirmative action, which the Board finds will effectuate the policies of the Act.

(1) Make whole Willard Moore;

(2) Post certain notices;

3. The respondent Idaho Potato Growers, Inc., and its officers, agents, successors, and assigns, shall, in addition:

a. Cease and desist from discouraging membership in Teamsters, Chauffeurs, Warehousemen & Helpers, Local 983, affiliated with the American Federation of Labor, et cetera.

b. Take the following affirmative action:

(1) Make whole Milo Rash;

(2) Post certain notices.

It is further ordered that the complaint be dismissed insofar as it alleges that the respondents L. S. Taube, Ted Taube, and L. B. Holden, co-partners doing business as L. S. Taube & Company, discriminated in regard to the hire and tenure of employment of Jack C. Hendricksen, C. A. Falk, Clency L. Wadsworth, Mervin Crandall, and Harold Goodell.

The petition of the dealers is denied. The petition of the Board for enforcement of its order is granted.

JAMES ALGER FEE, District Judge (concurring).

We may all agree, without hesitation, that the petitioners, and each of them, engaged in unfair labor practices in respect to certain of their employees in warehouse crews and in respect to the union as found by the Board and by the majority of this court. Both the Board and the majority, however, take away from the farmer the protection which Congress intended to give to him by the language of Section 2, Subdivision (3) of the Act, 29 U.S.C.A. § 152(3), which prevents control of, and organization of, the "agricultural laborer" under the authority of the National Labor Relations Act. This language is completely swept away by the findings of the Board and the reasoning of the majority. The damage caused by this elision is the more since the rights of the potato growers of Idaho are thus disposed of while they themselves are not directly parties to the litigation. Furthermore, the right of free speech is denied to these farmers in respect to their own interests by the characterization thereof as an unfair labor practice.

These erroneous results in intimating that the activities of farmers, protecting their own rights, were unfair labor practices, and in finding that members of cellar crews were not agricultural laborers, were ren-

312

dered possible by two improper processes: first, because of the determination of the union to organize the cellar crews; secondly, because of the improper lumping of utterly diverse interests and issues by the Board, resulting in one set of findings and order.

It may be agreed that the persons hired by the warehousemen and dealers to engage in the operations of sorting and grading potatoes at the warehouse and away from the farms, are employees subject to the Act, even though the farmer may still retain the title to the potatoes and may, indirectly, pay the price of the work, but the differentiation between such employees and those persons engaged as members of cellar crews, is plain. The initial confusion was caused when the attempt was made to organize cellar crews and the warehouse crews in one union, notwithstanding the direct language of the Act preventing organization of the agricultural laborer.

The Board made this confusion worse confounded by entertaining the joinder in one proceeding of a claim of unfair labor practices against (1) a farmer who raised, processed and marketed his own potatoes although he also marketed potatoes of others as a dealer, (2) a non-profit cooperative, grading, sorting and dealing in potatoes of farmer-members, and (3) a traffic association which consisted not only of those above mentioned, but of strict commercial dealers also. (See No. 2 of main opinion.)

The Board also complicated the situation, following the lead of the union, by its consideration of an order based upon, and relating without differentiation to, the various types of work done on the land in the possession of the farmer, or in his cellar, and work done in commercial warehouses and processing of potatoes for shipment in interstate commerce.

In this field there are two interests, each of which is definitely protected by the language of the Act. These interests are those of (a) employees, and (b) farmers. The policy which protects the first is not more strong than that which protects the second. Each policy is clearly set forth, the first by the body of the Act, and the second by the clause relating to the "agricultural laborer". The rights given by the language of this clause to farmers, in respect to such labor, are substantive and not adjective. It is error to treat this clause

as a procedural exemption which must be pleaded and proved by the party seeking to establish rights thereunder.

The Board disregarded the facts that these cellar crews do work which is still generally, and was formerly altogether, done by the farmer and the farmhands as a normal part of the operation of a farm, and that in many cases the farmer and his regular farmhands now engage in the work as part of a cellar crew. The Board disregarded the facts that the operations of the cellar crews are conducted on the land of the farmer with his facilities, in sorting and grading potatoes, which he owns. The Board disregarded the facts that the members of the cellar crews are generally permanent residents of the vicinity and are recruited largely from families of farmers and from agricultural laborers on the farms. The Board disregarded the facts that the farmer pays the members of the cellar crew, sometimes directly, but generally indirectly, and, in any event, retains an indirect control over their operations through his relations with the dealer. It is true, this operation is a preparation for market, but so is the selection of the seed which may be done under supervision, or on advice, of a dealer. It is true that the same crew often works in the warehouse and also in the cellar of a farmer, but this is no excuse for confusion as to the respective functions.

As a specific example of the application of the doctrines to one phase of this case, W. P. Wilson grew on his own land, certain potatoes which he harvested and sorted by means of a cellar crew in his own employ on his own land. If the implication of the findings of the Board, as affirmed by the majority, are that he must employ a union crew under such circumstances simply because he also warehouses and sells potatoes bought from others, then no potato grower in Idaho can escape regulation, notwithstanding the plain language of Congress. If as realists, we take any account of the facts, there is then no obstacle to the extension of like organization and regulation of agricultural laborers in the operations of planting the seed and preparing the ground.

The finding of the Board that members of a cellar crew engaged under such circumstances in the work of the farm, were not agricultural laborers, accords neither with the fact nor the law. This court

should not lend support to such doctrine based on the fanciful analogy of other cases, or at all.

Whether potatoes so handled upon the farmer's own land, actually reach the stream of interstate commerce, is beside the point. The plowing and the harrowing of the ground; the cutting and the dropping of the seed; the irrigation and cultivation of the growing crop; and the harvesting and sorting of the potatoes, are all forms of labor traditionally done by the farmer himself, his family and persons whom he hires. Unless we warp this pattern by casuistry, all such labor is local in character, bound to the soil and a part thereof. Unless we warp this pattern, attempted regulations or organization of such labor may well be beyond the pale of congressional or administrative power.

The farmers did attempt to protect their rights under this clause by holding meetings in protest and engaging in other activities to prevent the unionization of this field. Harsh language was undoubtedly used at such meetings and belligerent attitudes were taken by the farmers. (See Note 4 of the majority opinion.) The right of the farmers, inherently and under the language of Congress relating to an agricultural laborer, to demonstrate and to object to the regulation of the activities of themselves and their laborers, is at least on a par with the right of labor to strike. The expressions of the farmers are no more violent than those which are concomitances of the picket line. When such legitimate demonstrations against a destruction of their own rights, guaranteed in this Act, were cited as unfair labor practices, the Board committed error. The belief of the farmers, evinced by these manifestations of distrust, that action inimical to their interests was intended, is made fact by the finding of the Board that a member of a cellar crew is not an agricultural laborer. But the right of freedom of speech should not be a monopoly of the industrial employee. Whether this was a deliberate attempt upon the part of the union to get away from the plain language of the Act by organizing agricultural laborers, and whether the Board deliberately extended the scope of its findings without differentiation over diverse activities, or if, on the other hand, these results were accomplished on either part through an enthusiasm to carry out what they conceived to be the purposes of the National Labor Relations Act, this court should not place the stamp of approval upon the sweeping away of the clause of the Act relating to the agricultural laborer, nor should it, by implication, prejudice the fundamental rights of the farmers who are not parties to this litigation.

No language in the order of the Board expressly directs any of the plaintiffs to do, or to cease and desist from doing, anything with respect to members of cellar crews. There is nothing in the order to preclude plaintiffs from assembling such crews of unorganized workers separately from the warehouse crews, or to prevent farmers, either separately or cooperatively, from hiring their own cellar crews. Therefore, the writer concurs in the result. If the order of the Board could be interpreted by reference to relate to cellar crews, the writer would be compelled to dissent.